nunc pro tunc September 3, 1998

NO. 4-98-0096

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

LORENZO MAUN, M.D., ) Appeal from

Plaintiff-Appellant, ) Circuit Court of

v. ) Sangamon County

THE DEPARTMENT OF PROFESSIONAL ) No. 96MR0238

REGULATION and NIKKI M. ZOLLAR, )

Director of the Department of ) Honorable

Professional Regulation, ) Robert J. Eggers,

Defendants-Appellees. ) Judge Presiding. 

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

Plaintiff, Dr. Lorenzo Maun, appeals from a Decem­ber 1997 circuit court order affirming the suspension of his license to practice medicine for 18 months by defendants, the Illinois Department of Professional Regulation (Department) and its director, Nikki M. Zollar, based on Maun's violation of section 22(A)(25) of the Medical Practice Act of 1987 (Act) (225 ILCS 60/22(A)(25) (West 1992)).  Maun argues that (1) section 22(A)(25) of the Act is unconstitutionally vague; (2) section 22(A)(25) is an unconstitutional delegation of legis­lative authori­ty; (3) because the Department has failed to promulgate rules defining the phrase "[g]ross and wilful and continued over­charg­ing" as set forth in section 22(A)(25) (225 ILCS 60/22(A)(25) (West 1992)), it cannot enforce that section against him; and (4) the Department's decision was against the manifest weight of the evi­dence.  We affirm.

I. BACKGROUND

  Because the parties are familiar with the facts, we discuss them only to the extent necessary to put Maun's arguments in context.  In October 1993, defendants commenced disciplinary proceedings against Maun, a plastic surgeon licensed to practice medicine in Illinois.  The multicount disciplinary complaint sought the suspension or revocation of Maun's license or other disciplinary action on several grounds, including the alleged violation of section 22(A)(25) of the Act.  Section 22(A)(25) provides as follows:

"The Department may revoke, suspend, place on probationary status, or take any other disciplinary action as the Department may deem proper with regard to the license or visiting professor permit of any person is­

sued under this Act to practice medicine, or to treat human ailments without the use of drugs and without operative surgery upon any of the following grounds:

* * *

25.  Gross and wilful and continued overcharging for professional services, in­

cluding filing false statements for collec­

tion of fees for which services are not ren­

dered, including, but not limited to, filing such false statements for collection of mon­

ies for services not rendered from the medi­

cal assistance program of the Department of Public Aid under the Public Aid Code."  225 ILCS 60/22(A)(25) (West 1992).

According to the disciplinary complaint, Maun violated section 22(A)(25) by charging too much for services rendered to pa­tients.

The evidence at the disciplinary hearing conducted between October and December 1995 showed the following.  Dr. Bob Ryan, a plastic and reconstructive surgeon, testified that he had been in private practice since 1972 and was familiar with the fair and reasonable charges for various types of plastic surgery services.  Ryan had reviewed the patient records of Ashley J., Amanda M., and Steven H., which included descriptions of servic­es Maun­ had performed on those patients.   

Ryan testified that Ashley J.'s records showed that she was a three-year-old child who had been bitten on her face, tongue, and eye by a dog in August 1990.  Ashley J. was under anesthesia for 20 minutes, during which time Maun cleansed, debrided, and repaired her bite wounds.  Ryan testified that during the course of his career, he had treated patients suffer­

ing from dog bite wounds.  Ryan opined that Maun­ spent only 10 minutes actually operat­ing on Ashley J.  When asked by the Department whether Maun's $11,100 fee for Ashley's surgery constituted a "gross and willful overcharg­ing," Ryan stated the following:  "I can't really find words for that.  At most, ten minutes of operating time here, $11,000 I would say is maybe $10,000 too much."  

Ashley J.'s records also showed that she returned to Maun's office for scar excision and revision and dermabra­sion in October 1990.  Ryan opined that an appropriate fee for such an office procedure would be "at the upper side of $1,500."  When asked by the Department whether Maun's $3,900 fee for that procedure constituted a "gross and willful overcharging," Ryan stated, "[t]hat again would be way out of line."

Amanda M.'s records showed that she had clefts (elon­

gated open­ings) on both of her lower earlobes, and in June 1991, Maun reconstructed her right earlobe in his office using a technique known as Z-plasty (a procedure using a Z-shaped inci­

sion to relieve tension in scar tissue).  The Z-plasty procedure took approximately 15 to 20 minutes.  Ryan stated that the procedure is "very commonly performed," and he has treated "multi­ple" patients with torn earlobes.  He opined that a fair fee would be $600 per earlobe, plus $500 for supplies and operat­

ing room costs.  Ryan also opined that Maun's $6,653 fee for the procedure constituted gross, wilful, and "unconsciona­ble" over­

charg­ing.

Steven H.'s medical records showed that in July 1991, Maun­ performed an operation on Steven H., a 28-year-old man with four facial lacerations resulting from a minor car accident.  His medical records indicated that the surgery involved debride­ment abra­sion of his fore­head, plastic repair for wounds, includ­ing muscles, and microsur­gery repair of nerves.  Ryan testified that he was familiar with the type of plastic surgery Steven H. required, and during the course of his career, Ryan had treated patients who had suffered lacera­tions resulting from car acci­

dents.  Ryan opined that Maun's $16,767 fee constituted "very, very gross overcharg­ing."  He stated that a reasonable fee for the type and length of surgery would have totalled 25% of what Maun had charged Steven H. (around $4,190).  Ryan also opined that because the anesthesia report revealed that Steven H. was only in the operat­ing room for 45 minutes, "there is no way a plastic surgeon could repair--do microsurgery repair of a supra­

orbital nerve in the time allocated in this operation."  (Maun testified that the operation lasted 1 hour and 45 min­utes, and he re­paired Steven H.'s supraor­bital nerve using micro­surgery.)  Ryan further opined that the medical records indicated that Steven H.'s supraorbital nerve did not appear to have been damaged by any of the facial lacerations.

The Department also introduced deposition testimony of Drs. Gerald Harris and Michael Vender and an evaluation letter from Dr. Charles Carroll.  Maun stipulated to the admission of that evidence.  

Carroll, an orthopedic surgeon with training in micro­

surgery, reviewed the medical records of Eugene B., one of Maun's patients who complained of right-hand contracture and pain.  Between June 1990 and February 1991, Maun per­formed eight surger­

ies on Eugene B., with fees totalling $95,000.  In his evaluation letter, Carroll opined that Maun's surgical fees were exces­sive for many of the listed procedures and Maun had charged Eugene B. for duplicate and unneces­sary procedures.  In summariz­ing his review of the case, Carroll stated that "[i]n my experi­ence in multiple university centers I have not seen anyone require this much surgery." 

Harris, a plastic surgeon who specializes in hand surgery, examined and reviewed the medical records of Randy H., one of Maun's patients who had four fingers amputated during a work-related accident.  In December 1989, Maun performed a 14-

hour operation on Randy H. to reattach his fin­gers and charged him $108,989.  Harris opined that Maun's $108,989 fee was high.  He stated that a reasonable and customary fee for micro­surgery (the most diffi­cult type of surgery) would be $2,000 per hour, or $28,000 for a 14-hour surgery.  Vender, a plastic surgeon with an exper­tise in hand surgery, also examined Randy H. and reviewed his medical records.  He opined that Maun's $108,989 fee was excessive, and a reasonable rate for such surgery would be between $800 and $1,500 per hour.  He further opined that a reasonable fee for Randy H.'s 14-hour surgery would have been approximately $21,000.

Maun testified that, from 1989 through 1992, he prac­

ticed plastic surgery in Lake County, Illinois.  When ques­tioned by the Department about who had responsibility for billing practices in his office, Maun stated that he was unaware of his billing practices and explained that he was "only a [d]octor.  We have business people to do those things, and I hire people because I do not know."  He further stated that software techni­

cians had installed a fee schedule and billing software program which his office had purchased from the "Peach Tree people" after Maun had seen the software at a plastic surgery meeting.  His office person­nel also use other fees schedules which "they bought some place."  When asked to explain how he arrived at Ashley J.'s $11,100 bill, Maun stated as follows: 

"I don't know how they arrive at the amount.  When operative notes go to the office, they check how many wounds, and then they look on the code number and determine how many wounds were done.  And then they multiply how many wounds."  

Maun further stated that he believed his fees for the procedures he performed on Ashley J. were reasonable and appro­

priate.  He also stated that he was aware that Ashley J.'s attor­

ney had complained about the $11,100 charge.  Maun also testi­fied that when Amanda M.'s insurance company objected to his $6,653 fee for the Z-plasty procedure, his "billing people" reduced the charge to $940. 

Dr. Jimmy Alastair Chow, a plastic surgeon, testified on Maun's behalf that all surgical procedures Maun performed on Randy H. were necessary.  Chow refused to answer questions about Maun's billing practices or fees.   

Following the hearing, the hearing officer issued his ruling and found that Maun (1) had violated section 22(A)(25) of the Act; and (2) had engaged in dishonorable, unethical, or unprofessional conduct when he used retirement pension funds to alleviate a business cash shortage.  The hearing officer wrote, in relevant part, as fol­lows:

"12)  *** [Dr. Ryan] is very well quali­

fied to render expert opinions in this pro­

ceeding.  ***

13) Dr. Ryan reviewed the patient re­

cords of Amanda M. herein and was of the opinion that [Maun's] billing of $6,653.00 for services rendered in that mat­ter was gross and willful overcharging and unconscio­

nable.

14) Dr. Ryan reviewed the patient re­

cords of Ashley J. herein and was of the opinion that both billings by [Maun] of $11,100.00 and $3,900.00 constituted gross and willful overcharging. 

15) Dr. Ryan reviewed the patient re­

cords of Steven H. herein and was of the opinion that [Maun's] billing of $16,760.00 constituted very, very gross over­charging. 

* * *

17) *** Dr. Michael Vender is a Board[-] Cer­tified orthopaedic surgeon with a certifi­

cate for hand surgery since 1986.  He exam­

ined patient Randy H. on September 1990.  Further, he reviewed the records and billing of this patient from [Maun].  ***  His opin­

ion was that [Maun's] bill of $108,898.00 for the first surgical procedure herein is exces­

sive.

18) *** Dr. Gerald David Harris is Board Certified in plastic and reconstructive sur­

gery with specialties in hand, upper ex­tremi­

ty and reconstructive microsurgery.  ***  He examined Randy H. on November 7, 1990.  He also reviewed the patient's records and bill­ing from [Maun].  ***  His opinion was that [Maun's] bill for the initial surgical proce­

dure seem[ed] to be high.  A reasonable fee for difficult microsurgery is $2,000.00 an hour and a reasonable fee for more routine surgery would be $1,500.00 an hour.

* * *

28) Dr. Charles Carroll IV[] is a Board[-]Certified Orthopaedic Surgeon, who is a li­censed physician and surgeon in three states[,] including Illinois.  He has addi­

tional training in microsurgery.  ***  Dr. Carroll was of the opinion that [Maun's] surgical fees were excessive throughout his treatment of Eugene B.  Further, that several of the eight surgical procedures performed did not appear to be indicated.

* * *

CONCLUSIONS OF LAW

* * *

8) That the Department *** has proved by clear and convincing evidence that [Maun­] has violated [section 22(A)(25) of the Act].  The Department presented the testimony of Dr. Ryan[,] who was found to be well quali­fied to testify as to the issue of plastic surgical fees.  Dr. Ryan evaluated the re­cords and billing of Amanda M., Ashley J., and Steven H.  His opinion was that [Maun­] was guilty of gross overcharging in each of these cases and in one instance termed the fee as unconscio­

nable.  Dr. Ryan was a very credible witness who presented his testimony in a convincing manner.

Dr. Carroll is also well qualified to testify as to issues of hand surgery and fees related thereto.  ***  [H]e felt that [Maun's] billing was excessive in regard to his treatment of Eugene B.

***  Each doctor [Dr. Vender and Dr. Harris] is well qualified as an expert in hand surgery and billing pertaining thereto.  Dr. Vender's opinion was that the billing [for Randy H.] was excessive.  Dr. Harris said it was high.  ***

[Maun] offered no other testimony than his own in furtherance of the reason­ableness of his fees complained of herein.  Dr. Chow specifically refused to address the subject of fees in his testimony.  [Maun­] denied any overcharging.  He testified that his office personnel did the billing.  He testified when he received complaints about his billing, he would reduce his bill­ing.  [Maun] testified that billing complaints led him to computer­

ize the billing process.  The Hearing Officer was not im­pressed by [Maun's] testimony.  Through­out his testimony, he attempted to distance himself from his billing practices.  He dele­gated most billing duties to staff with lit­tle or no supervision.  Further, the fact that he was convicted of the federal crimes herein and he was fined $250.00 by the State of California regarding a failure to include information on his licensing applica­

tion casts a dark shadow over his credibility in [the Hearing Officer's] mind.

The Hearing Officer is persuaded that 
the
 
Department
 
has
 
presented
 
very
 
strong
 
evidence
 
that
 [
Maun
] 
had
 
a
 
pattern
 
of
 
gross
 
and
 
wilful
 
and
 
continued
 
overcharging
 in the cases cited heretofore in this sec­tion."  (Emphasis added.)    

Based upon those findings, the hearing officer recom­

mended that Maun be suspended for at least 18 months, pay a $22,000 fine, and complete continuing education courses.  In June 1996, the Department's Medical Disciplinary Board (Board) adopted the hearing officer's findings of fact, conclusions of law, and recommendations.  In August 1996, the Department adopted the Board's findings of fact, conclusions of law, and recommenda­tions and ordered that Maun be suspended for at least 18 months and pay a $22,000 fine.  

Maun subsequently sought adminis­trative review of the Department's decision by the circuit court.  In May 1997, the circuit court upheld the Department's deci­sion that Maun had violated section 22(A)(25) of the Act, but reversed the Depart­

ment's decision that Maun had engaged in dishonor­able, unethical, or unprofessional conduct.  The court thus remanded the matter for a redetermination of sanctions.  Upon remand, the Department found that Maun's violation of section 22(A)(25) warranted the same sanctions as had previously been imposed.  In December 1997, the court upheld those sanc­tions.  This appeal followed.

II.  ANALYSIS

A.  Vagueness Challenge

Maun first argues that section 22(A)(25) of the Act is unconstitutionally vague with respect to medical profession­als generally.  Specifically, he contends that the section "does not allow ordinary doctors to know what conduct is forbidden."  We disagree.

Initially, we note that Maun, citing 
City of Chicago v. Morales
, 177 Ill. 2d 440, 687 N.E.2d 53 (1997), incorrectly asserts that this court should employ the "void-for-vagueness" analysis that applies to penal statutes.  Because section 22(A)(25) of the Act is not a penal or criminal statute, that analysis does not apply in this case.  See 
Department of Correc­

tions ex rel. People v. Adams
, 278 Ill. App. 3d 803, 810, 663 N.E.2d 1145, 1150 (1996) ("void-for-vagueness" analysis ap­plica­

ble to penal stat­utes does not apply when challenged statute is not criminal or penal).   

Illinois courts always begin their analysis of the constitutionality of legislation with the presumption that the statute is constitutional.  
Lee v. Nationwide Cassel, L.P.
, 174 Ill. 2d 540, 549, 675 N.E.2d 599, 603 (1996).  The party chal­

lenging the statute bears the burden of "clearly establishing that the statute is unconstitutional."  
Rehg v. Illinois Depart­

ment of Revenue
, 152 Ill. 2d 504, 511-12, 605 N.E.2d 525, 529 (1992), 
overruled
 
on
 
other
 
grounds
 
by
 
Wilson v. Department of Revenue
, 169 Ill. 2d 306, 662 N.E.2d 415 (1996).  

A statute violates the due process clause of the United States Constitution or the Illinois Constitution on the basis of vagueness "'only if its terms are so ill-defined that the ul­

timate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts.'"  
Stern v. Norwest Mortgage, Inc.
, 179 Ill. 2d 160, 168, 688 N.E.2d 99, 103 (1997), quoting 
People v. Burpo
, 164 Ill. 2d 261, 265-66, 647 N.E.2d 996, 999 (1995).  A statute's terms must be explicit enough to serve as a guide to those who must comply with it.  However, mathematical certainty is not required.  
East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel
, 178 Ill. 2d 399, 425, 687 N.E.2d 1050, 1064 (1997).  Moreover, the fact that a statute might be suscep­tible to misapplication does not neces­

sarily make it unconstitu­tional.  
Stern
, 179 Ill. 2d at 168, 688 N.E.2d at 103.  Nor will a statute be rendered unconstitu­tionally vague merely because one could imagine hypothetical situations in which the meaning of some terms might be called into question.  
East St. Louis Federa­tion of Teachers
, 178 Ill. 2d at 425, 687 N.E.2d at 1064.       

The terms in section 22(A)(25) of the Act are capable of sufficiently precise interpretation to serve as a guide to those who must comply with that section.  The term "gross" has been defined as "[o]ut of all measure; beyond allowance; fla­

grant; shameful."  Black's Law Dictionary 702 (6th ed. 1990);  accord 
Gordon v. Department of Registration & Education
, 130 Ill. App. 2d 435, 438, 264 N.E.2d 792, 794 (1970).  "Gross" is also more commonly defined as "[g]laringly obvious; flagrant."  American Heri­tage Dictionary of the English Language 581 (1975).

The term "willful" has been defined as "[p]roceeding from a conscious motion of the will; voluntary; knowingly; deliberate.  Intending the result which actually comes to pass."  Black's Law Dictionary 1599 (6th ed. 1990); ac­cord 
People v. Clark
, 268 Ill. App. 3d 810, 814, 645 N.E.2d 590, 593 (1995).  "Wilful" is also more common­ly defined as "[s]aid or done in accordance with one's will; delib­erate."  American Heri­tage Dictionary of the English Language 581 (1975).  

The term "continue" has been defined as "[t]o go on with a particular action ***; persist."   American Heri­tage Dictionary of the English Language 581 (1975).  Black's Law Dictionary defines "continuing" as "[e]nduring; *** subsisting for a definite period."  Black's Law Dictionary 321 (6th ed. 1990). 

The term "overcharge" has been defined as "[t]o charge (a person) too high a price for something."  American Heri­tage Dictionary of the English Language 935 (1975).      

"A statute will be considered unconstitutionally vague on its face only where it is incapable of any valid application in the sense that no standard of conduct is specified at all."  
 Burpo
, 164 Ill. 2d at 266, 647 N.E.2d at 999.  The terms "gross," "wilful," "continued," and "overcharging" are not "so ill-defined that the ultimate decision as to [their] meaning rests on the opinion and whims of the trier of fact rather than any objective criteria or facts."  Thus, we conclude that those terms have commonly understood mean­ings suffi­cient to inform physi­cians what conduct is prohibited under section 22(A)(25) of the Act.  Accordingly, we hold that section 22(A)(25) does not fail for being unconsti­tu­tionally vague.    

In so holding, we specifically reject Maun's assertion that "if the State of Illinois intends to regulate the amount charged for physician's services, it must do so through a statu­

tory framework which provides adequate notice of the range of acceptable fees it is seeking to preserve."  As Justice Holmes wrote in 
Nash v. United States
, 229 U.S. 373, 377, 57 L. Ed. 1232, 1235, 33 S. Ct. 780, 781 (1913): 

"[T]he law is full of instances where a man's fate de­pends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.  If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death."     

In support of our holding, we note that section 22(A)(25) of the Act has been in existence for over 20 years (see Pub. Act 79-1130, eff. November 21, 1975 (1975 Ill. Laws 3473, 3478)), during which time it has had both legislative approval and admin­is­trative use.  Although the length of a statute's existence is not conclusive as to its constitu­tional­ity, it creates a strong presumption of validity.  
People ex rel. Drob­

nick v. City of Waukegan
, 1 Ill. 2d 456, 466-67, 116 N.E.2d 365, 371 (1953).

Although not necessary to our holding, we note that legislatures in other states have enacted statutes setting forth identical or similar grounds for disciplining physicians and other medical professionals.  See La. Rev. Stat. Ann. §37:1285(A)(16) (West 1988) ("Gross, willful, and continued over­

charging for profes­sional services"); R.I. Gen. Laws §5-37-

5.1(16) (1995) ("Gross and willful overcharging for professional services; including filing of false statements for collection of fees for which services are not rendered"); Wash. Rev. Code Ann. §18.83.121(9) (West 1989) ("Gross, wilful, or continued over­

charg­ing for professional services").  Moreover, we note that Il­

linois' legislature has enacted statutes setting forth identical or similar grounds for disciplining other medical professionals.  See, for example, 225 ILCS 100/24(23) (West 1996) ("Gross, will­

ful, and continued over­charging for professional [podiatric] servic­es");  225 ILCS 115/25(1)(BB) (West 1996) ("Gross, willful, or continued overcharging for professional [veterinary] servic­

es"); 225 ILCS 80/24(a)(33) (West 1996) ("Gross and willful over­

charg­ing for profes­sional [optomet­ric] services"); 225 ILCS 85/30(a)(17) (West 1996) ("Gross and willful overcharging for profes­sional [pharma­ceuti­cal] services").       

Maun also appears to argue--for the first time in his reply brief and without citation to the relevant pages of the record--that section 22(A)(25) of the Act is unconstitutionally vague as applied to him.  His argu­ment con­sists of the following:

"Because the Department has failed to explain how the Overcharging Statute provides notice to Illinois physicians as to what type of billing conduct it proscribes, this [c]ourt should declare the Overcharging Stat­

ute unconstitutional as applied to Dr. Maun­ who, under the undisputed facts in the re­

cord, never once billed for services he did not perform."

Maun raises this argument for the first time in his reply brief.  Under Supreme Court Rule 341(e)(7), points not argued in an appellant's brief are forfeited and shall not be raised in the reply brief.  155 Ill. 2d R. 341(e)(7).  In addi­

tion, Rule 341(e)(7) provides that the argument section of an appellant's brief "shall contain the contentions of the appellant and the reasons there­for, with citation of the authori­ties and the pages of the record relied on.  Evidence shall not be copied at length, but reference shall be made to pages of the record on appeal *** where evidence may be found."  155 Ill. 2d R. 341(e)(7).  Strict adher­ence to the require­ment of citing rele­

vant pages of the record is neces­sary to expedite and facili­tate the admin­is­tration of justice.  
Sohaey v. Van Cura
, 240 Ill. App. 3d 266, 273, 607 N.E.2d 253, 260 (1992).  Argu­ments that do not satisfy Rule 341(e)(7) do not merit consider­ation on appeal (
Sohaey
, 240 Ill. App. 3d at 273, 607 N.E.2d at 260) and may be rejected for that reason alone (
Calomino v. Board of Fire & Police Commis­sioners
, 273 Ill. App. 3d 494, 501, 652 N.E.2d 1126, 1132 (1995)).  In light of Maun's failure to comply with Supreme Court Rule 341(e)(7), we conclude that he has forfeited this issue on appeal.  More­over, we note that Maun does not argue that section 22(A)(25) was vague as applied to him such that he did not know whether his overcharging of patients for services actually rendered (as alleged in the disciplinary complaint) came within the purview of that sec­tion. 

B.  Improper-Delegation-of-Legislative-Authority Challenge

Maun next argues that section 22(A)(25) of the Act is an unconstitutional delegation of legislative authority because it gives the Department the authority to "regulate how much physicians may charge without establishing any standards whatso­

ever."  We disagree.

The power to make laws is a sovereign power vested in the legislature, and this power cannot be delegated to an admin­

istrative body.  While the legislature cannot delegate its legislative power to determine what the law should be, it may delegate the authority to execute the law.  Proper delegation of authority must provide sufficient standards to guide the adminis­

trative body in the exercise of its functions.  
East St. Louis Federation of Teachers
, 178 Ill. 2d at 423, 687 N.E.2d at 1063-

64.  However, "'[a]bsolute criteria whereby every detail neces­

sary in the enforcement of a law is anticipated need not be established by the General Assembly.  The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement.'"  
East St. Louis Federation of Teach­

ers
, 178 Ill. 2d at 423, 687 N.E.2d at 1063, quoting 
Hill v. Relyea
, 34 Ill. 2d 552, 555, 216 N.E.2d 795, 797 (1966).  To constitute a proper delega­tion of legislative authority, the statute in question must identify three factors:  (1) the persons or activities potential­ly subject to regulation; (2) the harm sought to be prevented; and (3) the general means available to the administrator to prevent the identified harm.  
East St. Louis Federation of Teachers
, 178 Ill. 2d at 423, 687 N.E.2d at 1064.  

Section 22(A) of the Act satisfies these requirements.  First, it identifies the parties subject to regulation--namely, any person who has been issued a license or visiting professor permit to practice medicine under the Act.  It also sufficiently identifies the activities potentially subject to regulation--namely, gross, willful, and continued overcharging for profes­

sional services, including both overcharging for services actual­

ly rendered and falsely charging for services not rendered.  

Second, with regard to the harm sought to be pre­vent­ed, we note that the legislature may use broader or more generic lan­

guage than with the first factor.  It is suffi­cient if it is apparent from the statute what the law is trying to pre­vent.  
East St. Louis Federation of Teachers
, 178 Ill. 2d at 424, 687 N.E.2d at 1063-64.  The Act lawfully prohib­its the practice of medicine except on the condi­tions it imposes, and the state's legitimate concern for main­taining high standards of professional conduct extends beyond the initial licensing.  The practice of medicine, in addition to skill and knowledge, re­quires honesty and integri­ty of the highest degree, and inherent in the state's power is the right to revoke the license of those who violate the stan­dards it sets.  See 
Kaplan v. Department of Registration & Education
, 46 Ill. App. 3d 968, 975, 361 N.E.2d 626, 631 (1977).  The purpose of section 22(A) is to maintain sound, professional standards of conduct for the purpose of protecting the public and the standing of the medical profession in the eyes of the public.  That section is intended to prevent the public harm that might occur were a physician--lacking in honesty and integri­ty--to grossly, willfully, and repeatedly overcharge for his profession­

al services.  

Third, section 22(A) specifically delin­eates the means available to prevent this harm, including suspen­sion or revoca­

tion of a medical license or visiting profes­sor permit, or being placed on probationary status.  With these three factors satis­

fied, we conclude that section 22(A) does not improperly delega­te legislative authority.

C.  The Department's Failure To Enact Rules Defining

"Gross and Wilful and Continued Overcharging"

Maun next argues that the Department can set standards only by rulemaking.  He thus contends that because the Depart­ment has failed to promulgate rules defining the phrase "gross and wilful and continued overcharging" as set forth in section 22(A)(25) of the Act, it cannot enforce that section against him.  We disagree.

Administrative agencies may establish standards of conduct for applying statutes by either rulemaking or adjudica­

tion.  The choice lies within the agency's sound discretion.  
Ron Smith Trucking, Inc. v. Jackson
, 196 Ill. App. 3d 59, 65, 552 N.E.2d 1271, 1276 (1990).  Thus, the Department was not required to enact rules establishing the standard of conduct of section 22(A)(25), and its decision not to do so does not render that section unenforceable against Maun.  See 
Boffa v. Depart­ment of Public Aid
, 168 Ill. App. 3d 139, 146, 522 N.E.2d 644, 648-49 (1988) (specific standards not required to justify an agency's finding of a violation of statutory provisions, even where the question may be one of first impression in an adjudica­tive context).  Because we conclude that the Department was not required to enact rules establishing the standard of conduct of section 22(A)(25), we need not address Maun's contention that the Department had effectively enacted such rules without complying with certain provisions of Illinois Administrative Procedure Act.  5 ILCS 100/1-1 
et
 
seq
. (West 1996).  

D.  Maun's Claim that the Hearing Officer's Decision Was 

Against the Manifest Weight of the Evidence 

Last, Maun argues that the hearing officer's deci­sion was against the manifest weight of the evidence.  We dis­agree.  

Upon judicial review of an administrative hearing officer's deci­sion, a review­ing court 
must
 
not
 reweigh the evidence or assess the credibility of witnesses.  See 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992).  It is for the hearing officer, as the trier of fact, to evaluate all evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts.  
Smith v. Department of Professional Regulation
, 202 Ill. App. 3d 279, 284, 559 N.E.2d 884, 887 (1990).  

The findings and conclu­sions of a hearing officer on ques­tions of fact are consid­ered to be 
prima
 
facie
 true and correct.  735 ILCS 5/3-110 (West 1994); see 
McCullough v. Illi­

nois State Board of Education
, 204 Ill. App. 3d 1082, 1086, 562 N.E.2d 1233, 1236 (1990).  A review­ing court may set aside those findings only when they are against the manifest weight of the evidence.  
McCullough
, 204 Ill. App. 3d at 1086, 562 N.E.2d at 1236.  A decision is contrary to the manifest weight of the evidence only where the opposite conclu­sion is clearly evident.  
Caldwell v. Department of Profes­sional Regulation
, 292 Ill. App. 3d 459, 463, 684 N.E.2d 913, 916-17 (1997).  The mere fact that an oppo­site conclu­sion is reason­able or that this court might have ruled different­ly does not justify reversal of the adminis­

trative findings and decision.  
McCullough
, 204 Ill. App. 3d at 1086, 562 N.E.2d at 1236.

The record here contains sufficient evi­dence to support the Department's deci­sion.  We specifi­cally reject Maun's conten­

tion that this court should set aside the Department's decision because Maun testified that he did not intend to over­charge his patients.  The hearing offi­cer, as the trier of fact, was free to disbelieve all or part of any witness' testimo­ny--includ­ing Maun's--if he so chose.  Moreover, wilfulness generally may be inferred from the actor's conduct and from other circum­stances.  See 
People v. Clark
, 268 Ill. App. 3d 810, 814, 645 N.E.2d 590, 593 (1995); see also 
Department of Revenue v. Roman S. Dombrowski Enterprises, Inc.
, 202 Ill. App. 3d 1050, 1055, 560 N.E.2d 881, 884 (1990).  The evidence here showed that Maun was aware of complaints that some of his fees were exces­sive.  In addi­tion, Maun had some familiarity with at least one of the fee sched­ule and billing software programs used in his office.  Further, the hearing officer specif­i­cal­ly found Maun's attempt to dis­tance himself from his billing proce­dures not to be credi­ble.  

We also reject Maun's contention that Ryan's testimony should be disregarded because it was given without any founda­

tion.  Ryan testified that he had been practicing plastic and reconstructive surgery since 1972 and was familiar with fair and reasonable charges for various types of plastic surgery services.  The pa­tients about whom Ryan testi­fied suf­fered inju­ries Ryan had experi­ence treat­ing--namely, dog bites, torn ear­lobes, and facial lacera­tions.  Steven H. was the only one of those patients who alleged­ly had microsur­gery, and Ryan testified that Steven H.'s medical records indi­cated that his supraorbital nerve did not appear to be damaged (such damage would have required micro­sur­

gery).  The hearing officer specifically found that Ryan was "well qualified to testify as to the issue of plastic surgical fees."  Moreover, the hearing officer found Ryan to be a very credible witness.  

Nor do we agree with Maun's contention that to prove that his overcharging was "continued," the Department had to present evidence such as an audit of his billings over a period of time.  The evidence here showed that during a 20-month period (Decem­ber 1989 through July 1991), Maun overbilled five of his patients for procedures he performed.  The evi­dence also showed that Maun overcharged one of those patients, Eugene B., for several proce­dures over a nine-month period, from June 1990 through February 1991.  On this evidence, an opposite conclu­sion is not "clear­ly evident."  

Accord­ing­ly, review­ing the record before us in accor­

dance with the appro­priate standard of review, we hold that the Department's deci­sion was not against the manifest weight of the evidence.

III. CONCLUSION

For the reasons stated, we affirm the circuit court's judgment upholding the Department's decision.

Affirmed.

GARMAN, P.J., and COOK, J., concur.