*In re* D.F. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Nancy Fleming, Respondent-Appellant).

Fourth District   No. 4—00—0475

Opinion filed April 13, 2001.

213

COOK, J., dissenting.

David W. Butler, of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In December 1999, the State filed a petition to terminate the parental rights of respondent, Nancy Fleming, regarding her minor children, E.K. (born September 16, 1987), T.K. (born November 30, 1991), and D.F. (born February 13, 1997). The State also filed a petition to terminate the parental rights of respondent's husband, Christopher Fleming, as to his daughter D.F. (T.K. and E.K. are respondent's children from a prior marriage.) Following a May 2000 hearing on the State's May 2000 amended petition, the trial court found respondent unfit. The court later determined that it would be in

the children's best interest to terminate respondent's parental rights. It likewise terminated Christopher's parental rights and this court addressed his appeal separately. *In re D.F.*, 317 Ill. App. 3d 461, 740 N.E.2d 60 (2000).

Respondent appeals, arguing that (1) the trial court's finding of parental unfitness was against the manifest weight of the evidence; (2) the court erred by denying respondent's motion to substitute judge for cause; and (3) the court's decision to terminate her parental rights was not in the children's best interest. We reverse in part, vacate in part, and remand with directions.

## I. BACKGROUND

In December 1997, the State filed a petition for the adjudication of wardship of E.K., T.K., and D.F. Paragraph 5(A) of that petition alleged that the minor children were neglected, pursuant to section 2—3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act), in that they were not receiving the proper or necessary support or remedial care necessary for their well-being (705 ILCS 405/2—3(1)(a) (West 1996)). Specifically, the State's petition alleged the following:

> "[T]he family residence was found by the Illinois Department of Children and Family Services [(DCFS)] [i]nvestigator to be filthy. The floors were covered with cat feces, cat litter, and clutter to such a degree that the floors were impassible. The bedroom doors were unable to be opened because of the clutter stacked against the doors and wall, and old food was found along the walls in the kitchen area."

In April 1998, respondent admitted and stipulated to the allegations in paragraph 5(A) of the petition and the State dismissed other allegations. The trial court then adjudicated E.K., T.K., and D.F. neglected.

The trial court conducted dispositional hearings on May 27, 1998, and August 12, 1998. Following the May 1998 hearing, the court appointed DCFS temporary custodian of all three children. The court granted E.K. and T.K.'s father, John K., who then resided in Wisconsin, extended visitation with E.K. and T.K. At the close of the August 1998 hearing, the court entered a dispositional order that adjudicated respondent's children wards of the court and appointed DCFS as their guardian with the power to place them. 705 ILCS 405/2—27(1) (West 1998). The court also removed D.F. from respondent's home and placed her in a foster home. E.K. and T.K. were placed with John.

On September 17, 1999, the trial court entered a permanency order setting the goal, as to E.K. and T.K., as remaining home with their father; and as to D.F., as substitute care pending court determination on the petition to terminate parental rights.

In December 1999, the State filed a petition to terminate respondent's parental rights pursuant to several sections of the Adoption Act (Act) (750 ILCS 50/1 through 24 (West 1998)). In its May 2000 amended petition, the State alleged that respondent was unfit because (1) she substantially neglected the children in a continuous or repeated fashion (750 ILCS 50/1(D)(d) (West Supp. 1999)); (2) other neglect of, or misconduct toward, the children occurred (750 ILCS 50/1(D)(h) (West Supp. 1999)); (3) she had an inability to discharge her parental responsibilities (750 ILCS 50/1(D)(p) (West Supp. 1999)); (4) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children (750 ILCS 50/1(D)(m)(i) (West Supp. 1999)); (5) she failed to make reasonable progress toward the return of the children within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West Supp. 1999)); and (6) she failed to make reasonable progress toward the return of the children during any nine-month period after the end of the initial nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(iii) (West Supp. 1999)).

A summary of the pertinent evidence presented at the May 2000 hearing on the State's petition to terminate respondent's parental rights follows.

Betty Schapmire, a DCFS investigator, testified that she became involved with respondent's case in November 1997 when she received a hot-line report alleging environmental neglect. She later visited respondent's home and observed that it was cluttered throughout, although the bedrooms and kitchen were the most severely cluttered areas. The bedrooms were covered with clothing, and the door to the master bedroom would not open completely because clothes were piled behind the door. Very little floor space was available in the children's bedroom. Dishes were stacked in the kitchen, and Schapmire could not tell if they were clean or dirty. She observed food particles on the floor. A cat litter box located in the entryway to the bathroom and bedroom area of the house was filled to the top with animal feces. She also saw animal feces on the floor near the box. Upon entering the residence, she smelled animals and cat feces.

After her visit, Schapmire made an indicated report and referred the family to Family First services. She did not think the household situation warranted immediate removal of the children but that the family could, with the help of referral services, deal with the situation. She was concerned that D.F.'s size and weight were low for a child D.F.'s age and initiated an investigation regarding nonorganic failure-to-thrive syndrome. As a result of that investigation, a doctor diagnosed D.F. as suffering from nonorganic failure to thrive, and Schapmire made an indicated report to that effect.

Theresa Kelly, a DCFS caseworker, testified that she became involved with respondent's case in November or December 1997. When Family First became involved, T.K. was thin, and her hair was dull. Family First personnel were concerned about the children's dirty clothes, body odor, and lack of hygiene. All of the children needed dental care. E.K. was combative and had become "parentified," meaning that she was attempting to protect the family as a parent would and performed parental functions, such as greeting the social services personnel at the door. E.K. also was failing in school.

In April 1998, respondent's progress on her client service plan was rated "satisfactory." However, Family First personnel reported that the family "just minimally made" the minimal parenting standards and expressed grave concerns about the family remaining stable. The Family First staff believed that DCFS needed to stay involved.

Kelly testified generally that respondent was dishonest with social service providers and that the family moved frequently and displayed little stability. After Family First became involved, D.F. gradually began to gain weight.

Kelly also testified regarding respondent's ratings at an August 1998 case review based on the May 1998 client service plan goals. Respondent's work with Services for Parent Infant Child Education (SPICE) regarding D.F.'s care was satisfactory. She was rated unsatisfactory on the goals of (1) maintaining a stable environment and (2) understanding child and family development. She did not attend counseling on a regular basis and did not adhere to all of the trial court's orders.

In April 1999, Family First reported that it had successfully addressed D.F.'s failure to thrive and the home environment met minimal parenting standards.

Dr. Marty Traver, a clinical psychologist, testified that she evaluated respondent for DCFS in November 1998 and December 1999. At the November 1998 evaluation, she concluded that respondent "failed to maintain stability in her housing, employment, and relationships; that she failed to meet the minimal expectation for hygienic conditions in the household, and appeared to have neglected her children's medical well-being through the dental care issue." She also concluded that respondent did not understand the concerns about her parenting.

Following the December 1999 evaluation, respondent still did not understand why D.F. had been removed from her custody. Traver believed that respondent had the psychological and intellectual capacity to meet minimal parenting standards but she had not done so because of her continuing denial about the issues. She concluded that respondent's prognosis was poor based on her failure to acknowledge

her past deficits as a parent and the amount of time remaining for her to remedy deficiencies.

Holly Hardin, a clinical psychologist for Chestnut Health Systems, counseled respondent and Christopher from February 1999 to August 1999. She testified that during that time, respondent's progress on minimum parenting standards was unsatisfactory. Respondent had reached no successful resolution of the issues and had not progressed to the level needed for "true change." Hardin cited respondent's unwillingness to change and her failure to do homework assignments.

Shannon Perkins testified that she was the court-appointed special advocate assigned to respondent's case from April 1999 to May 2000. Respondent and Christopher changed employers several times during that year, and caseworkers found inconsistencies between respondent's explanations for job changes and the explanations provided by her various employers. In January 2000, Perkins concluded that although respondent and Christopher tried to comply with the client service plan, when "things got too much for them, they quit and put the blame on somebody else." They therefore did not succeed.

Respondent testified that she had been married to John from 1985 to 1993. She and John were awarded joint custody of E.K. and T.K., and she was granted physical custody. Respondent and John had no contact between 1993 and July 1997, but John could have reached respondent by contacting her mother. She denied that she intentionally kept the children from John. She moved seven times between 1993 and 1997 and changed her name twice (due to remarriage). She kept in touch with John's parents.

Karen K., John's wife, testified that between 1994 and 1997, when John and the children were not in contact, John had called respondent's mother on more than one occasion, and she told him that she did not know where respondent was. Finally, in 1997, Karen obtained a phone number for respondent by having one of her friends call respondent's mother and pretend to be looking for respondent for a high school reunion.

Following the May 2000 fitness hearing, the trial court found that the State had proved respondent unfit based on the first, second, fourth, and sixth grounds alleged. The court conducted a dispositional hearing later that day and found that it was in the children's best interest to terminate respondent's parental rights. This appeal followed.

## II. THE TRIAL COURT'S FINDINGS OF UNFITNESS

■ Because termination of parental rights is an extraordinarily serious matter, the State must prove parental unfitness by clear and

convincing evidence. *In re M.F.*, 304 Ill. App. 3d 236, 238, 710 N.E.2d 519, 522 (1999). A finding of unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence (*In re A.P.*, 277 Ill. App. 3d 592, 598, 660 N.E.2d 1006, 1010 (1996)), and great deference is afforded the trial court, given its far superior opportunity to view and evaluate the witnesses and their testimony (*In re D.L.W.*, 226 Ill. App. 3d 805, 811, 589 N.E.2d 970, 974 (1992)). This court will uphold a finding of unfitness if the record contains sufficient evidence on any one statutory ground, even if the evidence is not sufficient to support the other grounds alleged. *M.F.*, 304 Ill. App. 3d at 238, 710 N.E.2d at 522.

### A. Unfitness Pursuant to Section 1(D)(d) of the Act

■ Respondent first argues that the State failed to prove by clear and convincing evidence that she was unfit pursuant to section 1(D)(d) of the Act, which provides that a parent can be found unfit based on evidence of "[s]ubstantial neglect of the child if continuous or repeated." 750 ILCS 50/1(D)(d) (West Supp. 1999). In its oral ruling, the trial court indicated that it based its section 1(D)(d) finding on evidence of the following four matters: (1) environmental neglect; (2) D.F.'s failure-to-thrive diagnosis; (3) respondent's withholding T.K. and E.K. from John between 1993 and 1997; and (4) respondent's inducing T.K. to lie about a bruise on her thigh and accuse Karen of abuse. For the following reasons, we disagree with the court's finding that these incidents constitute "substantial neglect" that is "continuous or repeated" so as to satisfy the requirements of section 1(D)(d) of the Act. We therefore reverse the court's finding of unfitness on this ground.

Under section 1(D)(d) of the Act, the State must prove that (1) the neglect was "substantial," and (2) it was either "continuous or repeated." In other words, the State must prove more than that the neglect was *either* "substantial" *or* "continuous or repeated"; the State must prove both. 750 ILCS 50/1(D)(d) (West Supp. 1999).

■ The General Assembly has thrice defined "neglected child." Section 2—3(1) of the Juvenile Court Act defines "neglected minor," in pertinent part, as follows:

> "(a) any minor under 18 years of age who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing[,] and shelter, or who is abandoned by his or her parents or other person responsible for the minor's welfare ***; or
>
> (b) any minor *** whose environment is injurious to his or her welfare; or

(c) any newborn infant whose blood, urine, or meconium contains any amount of a controlled substance ***; or

(d) any minor under the age of 14 years whose parent or other person responsible for the minor's welfare leaves the minor without supervision for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of that minor." 705 ILCS 405/2—3(1) (West 1998).

Section 1(Q) of the Act defines "neglected child" as follows:

"[A]ny child whose parent or other person responsible for the child's welfare withholds or denies nourishment or medically indicated treatment[,] including food or care denied solely on the basis of the present or anticipated mental or physical impairment as determined by a physician acting alone or in consultation with other physicians or otherwise does not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a child's well-being, or other care necessary for his or her well-being, including adequate food, clothing[,] and shelter; or who is abandoned by his or her parents or other person responsible for the child's welfare." 750 ILCS 50/1(Q) (West Supp. 1999).

Section 3 of the Abused and Neglected Child Reporting Act (325 ILCS 5/3 (West 1998)) defines "neglected child," in pertinent part, as follows:

"[A]ny child who is not receiving the proper or necessary nourishment or medically indicated treatment[,] including food or care not provided solely on the basis of the present or anticipated mental or physical impairment as determined by a physician acting alone or in consultation with other physicians or otherwise is not receiving the proper or necessary support or medical or other remedial care recognized under State law as necessary for a child's well-being, *** including adequate food, clothing[,] and shelter; or who is abandoned by his or her parents or other person responsible for the child's welfare without a proper plan of care; or who is a newborn infant whose blood, urine, or meconium contains any amount of a controlled substance ***."

Section 1(D)(d) of the Act, by its reference to "substantial neglect," manifests the General Assembly's belief that neglect, however it is defined, can be measured by degrees. Definitions of "substantial" include "considerable in quantity" and "significantly great." Merriam-Webster's Collegiate Dictionary 1174 (10th ed. 1996).

As the following examples demonstrate, the statutory definitions of neglect allow for the application of modifying adjectives such as "substantial." (1) Depriving a child of proper nourishment, such that the child is malnourished and underweight, would no doubt satisfy

any of the statutory definitions of neglect provided above (see 705 ILCS 405/2—3(1) (West 1998); 750 ILCS 50/1(Q) (West Supp. 1999); 325 ILCS 5/3 (West 1998)). Depriving a child of nourishment to the point of near starvation, however, would inarguably constitute substantial, or even extreme, neglect. (2) Providing a child with inadequate shelter and clothing constitutes neglect. However, keeping a child in inhumane conditions, such as living in a cardboard box in the wintertime, would no doubt constitute neglect that could be characterized as "substantial."

These examples illustrate that neglect can be measured on a continuum from minor to extreme. To constitute "substantial neglect" under section 1(D)(d) of the Act, the incidents of neglect would have to fall somewhere beyond the midpoint of the continuum but would not necessarily have to be extreme.

Another way to measure neglectful conduct under section 1(D)(d) of the Act is to consider whether the alleged acts of neglect were so severe that giving the offending parent an opportunity to remediate them would be unconscionable. In most cases involving neglected children, the State, as here, initially files a petition alleging neglect under the Juvenile Court Act. If the State prevails on that petition, the parent responsible for the neglect is given an opportunity to remediate the circumstances that gave rise to the neglect finding. Most State petitions to terminate parental rights are filed when the State asserts, again as here, that the parent has failed to remediate those circumstances under section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West Supp. 1999))—the so-called failures to make either "reasonable progress" or "reasonable efforts."

Under other sections of the Act, however, such as section 1(D)(d), a parent's rights can be terminated outright—that is, without the parent's first being given the opportunity to remediate the neglect. The Act's allowance for this outright deprivation of parental rights manifests the legislature's belief that some cases of neglect are so heinous that a child's best interest can only be served by severance of parental rights without giving the parent the chance to remediate. Thus, when the State alleges unfitness under section 1(D)(d) of the Act, the instances of "substantial neglect" should be such that remediation would not be an appropriate option.

■ We cannot definitively say what "substantial neglect that is continuous or repeated" means in all cases. We are confident, however, that whatever it means, the record in this case does not meet the necessarily high standard. The incidents of neglect contained in this record are of a kind frequently found in neglect cases, and nothing about this case suggests the extreme circumstances in which remediation

should not even be appropriately considered. We therefore hold that the trial court's finding of unfitness pursuant to section 1(D)(d) of the Act was against the manifest weight of the evidence.

## B. Unfitness Pursuant to Section 1(D)(h) of the Act

Respondent next argues that section 1(D)(h) of the Act (750 ILCS 50/1(D)(h) (West Supp. 1999)) is unconstitutionally vague. We agree.

■ "Illinois courts always begin their analysis of the constitutionality of legislation with the presumption that the statute is constitutional." *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 396, 701 N.E.2d 791, 798 (1998). The party challenging a statute has the burden of clearly establishing the alleged constitutional violation, and courts are obligated to affirm the validity of statutes if possible and to construe statutes so as to avoid doubts as to their validity. *Kaufman, Litwin & Feinstein v. Edgar*, 301 Ill. App. 3d 826, 830, 704 N.E.2d 756, 760 (1998).

### 1. *Applicability of the Void-for-Vagueness Doctrine*

■ The void-for-vagueness doctrine is generally only applicable to the analysis of penal or criminal statutes. See *Department of Corrections ex rel. People v. Adams*, 278 Ill. App. 3d 803, 810, 663 N.E.2d 1145, 1150 (1996). However, given (1) the stakes involved in a termination of parental rights proceeding and (2) the nature and extent of the State's intrusion into family life that occurs in such cases, we conclude that the legislative enactment that provides the justification for that intrusion should be able to withstand analysis under the void-for-vagueness doctrine.

In *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 68 L. Ed. 2d 640, 649-50, 101 S. Ct. 2153, 2159-60 (1981), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558, 92 S. Ct. 1208, 1212 (1972), the Supreme Court wrote: "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful counterveiling interest, protection.' " Our own supreme court recognized the magnitude of the interests at stake in termination proceedings when, in *In re Paul*, 101 Ill. 2d 345, 354-55, 461 N.E.2d 983, 987 (1984), it wrote:

> "A judgment that a parent is unfit to rear his or her own child is one of the most devastating of judicial decisions. A fundamental right is involved; parents have rights superior to others, including the State, in the rearing of their child unless it is shown by clear and convincing evidence they have forfeited one of mankind's most important rights."

Because the right to rear one's own children is fundamental and the termination of that right so devastating, we conclude that the statute providing the grounds for the termination of parental rights must be held to essentially the same standard as a criminal statute proscribing particular conduct. Thus, we hold that the void-for-vagueness doctrine applies when analyzing section 1(D)(h) of the Act.

In so holding, we note that other courts have afforded parents subject to termination proceedings procedural protections akin to those afforded defendants in criminal trials. See *In re J.P.*, 316 Ill. App. 3d 652, 658, 737 N.E.2d 364, 368-69 (2000) (because termination of parental rights proceedings involve fundamental liberty interests, a parent should be afforded procedural safeguards analogous to those provided in a criminal context); *In re M.H.*, 313 Ill. App. 3d 205, 214-15, 729 N.E.2d 86, 94-95 (2000) (an admission of unfitness is analogous to a plea of guilty in a criminal trial, and the trial court must find that a factual basis exists for an admission of unfitness in order to ascertain that it is entered knowingly and voluntarily), *appeal allowed*, 191 Ill. 2d 531, 738 N.E.2d 926 (2000) (No. 89599).

### 2. *Section 1(D)(h) of the Act Is Unconstitutionally Vague*

■ In the criminal law context, the void-for-vagueness doctrine requires that a proscription on conduct be defined (1) with sufficient definiteness to give persons of ordinary intelligence a reasonable opportunity to distinguish between lawful and unlawful conduct; and (2) in a manner that does not encourage arbitrary and discriminatory enforcement. *City of Chicago v. Powell*, 315 Ill. App. 3d 1136, 1146, 735 N.E.2d 119, 127 (2000). Section 1(D)(h) of the Act does not satisfy either requirement.

■ Section 1(D)(h) of the Act provides as a ground for a finding of unfitness, "[o]ther neglect of, or misconduct toward[,] the child." 750 ILCS 50/1(D)(h) (West Supp. 1999). Patent inconsistencies exist between subsection (h) and the other subsections of section 1(D) of the Act. For instance, subsection (d) provides that "neglect" can be grounds for unfitness, but only if it is substantial and continuous or repeated. It logically follows that, under section 1(D)(d) of the Act, one isolated act of ordinary neglect would not constitute grounds for a finding of unfitness, and presumably the legislature did not intend for ordinary neglect alone to be grounds for unfitness. However, it is not clear that ordinary neglect would not constitute a sufficient ground for termination of parental rights under section 1(D)(h).

Moreover, the phrase "other neglect or misconduct" suggests something less than "abuse." However, under section 1(D)(e) of the Act, even "cruelty"—which appears to be a step beyond "abuse"—is

not a sufficient ground for unfitness unless it is either "extreme" or "repeated." Under that section, no provision exists for a finding of unfitness based on an isolated act of cruelty that is not extreme. Yet, under section 1(D)(h), one act of cruelty could be characterized as an act of "other negligence or misconduct."

Further, subsection (h), whether read alone or in context with the other provisions of the Act, fails to inform persons of ordinary intelligence what conduct constitutes grounds for a finding of unfitness. Thus, parents are left to guess what the phrase "other neglect or misconduct" might mean, and they have nothing to guide them, except that whatever it means, it apparently is different from the statutory definitions of neglect contained in section 2—3(1) of the Juvenile Court Act (705 ILCS 405/2—3(1) (West 1998)), section 1(Q) of the Act (750 ILCS 50/1(Q) (West Supp. 1999)), and section 3 of the Abused and Neglected Child Reporting Act (325 ILCS 5/3 (West 1998)).

Equally troubling is that, under section 1(D)(h) of the Act, State's Attorneys have unfettered latitude, at least in the first instance, to define this statutory provision, even though it forms the basis for the termination of "one of mankind's most important rights." *Paul*, 101 Ill. 2d at 355, 461 N.E.2d at 987. Because section 1(D)(h) of the Act is utterly standardless, it puts parental rights at risk whenever the local prosecutor reads his or her own definition of "neglect" or "misconduct" into the statute and convinces the trial court to agree.

Because section 1(D)(h) of the Act does not adequately inform persons of ordinary intelligence what conduct constitutes grounds for unfitness and because it permits arbitrary prosecution, we hold that it is unconstitutionally vague and reverse the trial court's finding of unfitness on this ground.

### III. THE MOTION TO SUBSTITUTE JUDGE

Respondent next argues that the trial court erred by denying her motion for substitution of judge for cause. We disagree.

Pursuant to section 2—1001 of the Code of Civil Procedure (Code), parties to a civil action may petition for a substitution of judge for several different reasons. 735 ILCS 5/2—1001(a)(1) through (a)(3) (West 1998). Pursuant to section 2—1001(a)(2) of the Code, each party is entitled to a substitution of judge as of right, provided that the party timely exercises that right, while pursuant to section 2—1001(a)(3) of the Code, any party may petition for substitution of judge for cause.

In this case, respondent filed a motion to substitute judge for cause pursuant to section 2—1001(a)(3) of the Code on September 17, 1999, the same day the trial judge entered his order setting the permanency goal for T.K. and E.K. as remaining home with their father

and for D.F. as substitute care pending court determination on the petition to terminate parental rights. At the November 1, 1999, hearing on that motion, respondent's counsel commented that the State had filed a petition to terminate respondent's parental rights and argued that the trial judge's comments at earlier proceedings manifested his bias against respondent. Counsel thus argued that the judge should not preside over the termination proceedings. At that point in time, however, termination proceedings had not commenced; the State did not file its petition to terminate respondent's parental rights until December 13, 1999, more than one month later.

By filing a motion to terminate parental rights, the State initiated an entirely new proceeding, albeit in the same circuit court case number (No. 97—JA—90). Although the record of the preceding juvenile proceedings is related to the termination proceeding, the filing of the termination petition nonetheless begins a new case within that case number. Because the parties apparently misunderstood this concept, they filed the wrong motion at the wrong time.

Pursuant to section 2—1001(a)(2) of the Code, each party is entitled to one substitution of judge *as of right*, so long as the party seeking substitution files its motion before hearings begin and before the judge has ruled on any substantive issue in the case. 735 ILCS 5/2—1001(a)(2) (West 1998); *In re Marriage of Abma*, 308 Ill. App. 3d 605, 609, 720 N.E.2d 645, 649 (1999). Had respondent's motion for substitution of judge been appropriately identified as a substitution of judge as of right (735 ILCS 5/2—1001(a)(2) (West 1998)), and had it been filed without delay following the State's filing of its termination petition, the trial court would have erred by denying it. However, respondent here filed a motion for substitution of judge intending that a different judge preside over termination proceedings, which were not then pending.

Although a party is required to file a motion for substitution of judge as of right at the "earliest practical moment" in time (*Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d 644, 648, 681 N.E.2d 993, 996 (1997)), the motion must be filed in a case in which the petition at which it is directed is actually pending (735 ILCS 5/2—1001(b) (West 1998)). No law permits the filing of a motion for substitution of judge in a proceeding before the proceeding has begun. A motion that is filed in a nonexistent proceeding is essentially null and void. Accordingly, because any ruling on a motion filed in such a proceeding is equally null and void, the trial court's denial of the motion for substitution of judge cannot be error and cannot serve as a basis for otherwise reversing its rulings.

## IV. CONCLUSION

For the reasons stated, we reverse in part and vacate in part the trial court's findings of unfitness and remand for further proceedings consistent with the views expressed herein.

Reversed in part and vacated in part; cause remanded with directions.

KNECHT, J., concurs.

JUSTICE COOK, dissenting:

I respectfully dissent and would affirm the decision of the trial court.

The petition for wardship in this case was filed in December 1997. At that time, the family residence was filthy, with floors covered with cat feces and litter, doors unable to be opened because of clutter, and old food along the walls. T.K. was thin, her hair was dull, and Family First personnel were concerned about the children's dirty clothes, body odor, and lack of hygiene. A doctor diagnosed D.F. as suffering from nonorganic failure to thrive. E.K., failing in school, was performing parental functions.

In May 1998, the trial court conducted a dispositional hearing. Family First personnel reported the family "just minimally made" the minimal parenting standards and expressed grave concerns about the family remaining stable. Respondent was rated unsatisfactory on the goals of maintaining a stable environment and understanding child and family development. She did not attend counseling on a regular basis and did not adhere to all the trial court's orders. Following the May 1998 hearing, the trial court appointed DCFS temporary custodian of the three children. In August 1998, D.P. was placed in a foster home, and E.K. and T.K. were placed with their father in Wisconsin.

Respondent's progress on minimum parenting standards was unsatisfactory from February 1999 to August 1999. Respondent had reached no successful resolution of the issues and had not progressed to the level needed for true change. Respondent was unwilling to change and failed to do counseling assignments. Dr. Marty Traver evaluated respondent in December 1999 and concluded that respondent had the psychological and intellectual capacity to meet minimal parenting standards but had not done so because of her continuing denial about the issues. She concluded that respondent's prognosis was poor based on her failure to acknowledge her past deficits as a parent and the amount of time remaining for her to remedy deficiencies.

In December 1999, the State filed a petition to terminate respondent's parental rights. Following a May 2000 hearing, the trial court found the State had proved respondent unfit on a number of grounds, including "[s]ubstantial neglect of the child if continuous or repeated." 750 ILCS 50/1(D)(d) (West Supp. 1999). The majority concludes that decision of the trial court, on the basis of the facts set out above, is contrary to the manifest weight of the evidence.

The majority bases its conclusion on the following: (1) neglect cannot be "substantial" simply because it is "continuous or repeated"; (2) "substantial" means "considerable" or "significantly great"; (3) "substantial neglect" means something like depriving a child of nourishment to the point of near starvation or forcing a child to live in a cardboard box in the wintertime; (4) "substantial neglect" would have to fall somewhere beyond the midpoint on a continuum from minor to extreme; and (5) the State cannot rely on "substantial neglect" when the more appropriate ground would be failure to make "reasonable progress" or "reasonable efforts." The majority is confident that the incidents of neglect contained in this record are of a kind frequently found in neglect cases, and nothing about this case suggests the extreme circumstances in which remediation should not even be appropriately considered.

I disagree with the suggestion that a child has to be near death before the trial court can find substantial neglect. "Substantial" is primarily defined as "consisting or relating to substance, not imaginary or illusory." Webster's New Collegiate Dictionary 1161 (1976). Trivial matters cannot be the basis of substantial neglect. There must be some substance to the matters, and there certainly was that here. The majority's rule that the continuous nature of the neglect cannot be considered in determining whether neglect is substantial is not supported by the statute, by case law, or by logic. Even comparatively mild neglect can be catastrophic when it is continuous or repeated. When the legislature listed alternate grounds for finding unfitness, it intended to avoid locking the State into a few theories which might not fit the infinite number of factual situations with which it would be presented. I do not understand why the majority would hamstring the State with a requirement that a finding of substantial neglect must be reversed where failure to make reasonable progress or reasonable efforts would have been better alleged. The question here is not whether the petition to terminate could have been better pleaded. The question is whether "substantial neglect" has been proved. I believe it was. This case was pending from December 1997 until August 1998 before the children were taken from respondent. The case was pending from August 1998 until May

2000 before respondent's parental rights were terminated. This was not a case where remediation was not even considered.

The majority recites the standard of review in this case and then ignores it. A finding of unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.M.*, 305 Ill. App. 3d 154, 163, 711 N.E.2d 809, 815 (1999). Great deference is afforded the trial court, given its far superior opportunity to view and evaluate the witnesses and their testimony. The fact that the majority might have found there was no substantial neglect if it had been the trial court is irrelevant.

Because the trial court properly terminated parental rights on the basis of substantial neglect, I would not address the other issues raised by the majority. I would suggest, however, that it is a major step on the part of an appellate court to declare an act of the legislature unconstitutional. The words "other neglect" should be read, in *pari materia* with the other language of the statute, not to include neglect which is comparatively minor.

Finally, I disagree with the proposition that, when the State files a motion to terminate parental rights in a juvenile proceeding, "an entirely new proceeding" is commenced which allows the respondent to substitute, as of right (735 ILCS 5/2—1001(a)(2) (West 1998)), the judge who has been presiding over the juvenile proceeding and has made rulings with which the respondent disagrees. The majority's decision is contrary to the substitution statute, which follows the policy that a litigant should not be allowed to test the waters before he exercises a substitution as of right. 735 ILCS 5/2—1001(a)(2)(ii) (West 1998) ("application for substitution of judge *** shall be granted if it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case"). The majority's decision that separate proceedings are involved is at odds with the Juvenile Court Act, which provides that the parties are not entitled to additional notice upon the filing of an amended petition or a motion to terminate parental rights. 705 ILCS 405/2—15(3) (West 1998). The legislature has expressly provided that there is no right to automatic substitution if the judge has made a substantive ruling in a proceeding involving the minor's *sibling*. 705 ILCS 405/1—5(7) (West 1998). Before today's decision, the legislature could not have anticipated that it needed to be concerned with automatic substitution where the judge had made a substantive ruling in a proceeding involving the minor herself.