SIXTH DIVISION
June 15, 2007

No. 1-06-0266

RUSSELL MORGAN,

        Plaintiff-Appellant,

v.

THE DEPARTMENT OF
FINANCIAL AND PROFESSIONAL
REGULATION,

        Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the
Circuit Court of
Cook County, Illinois.

No. 05 CH 03127

Honorable
Anthony Young,
Judge Presiding.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff, Russell Morgan, brought a complaint for administrative review challenging the

Illinois Department of Financial and Professional Regulation's (Department) summary

suspension of his license as a clinical psychologist and the Department's ultimate imposition of a

90-day suspension and indefinite probation. The circuit court affirmed the Department and

denied Morgan's subsequent motion for reconsideration. Morgan now appeals those orders. For

the reasons that follow, we reverse.

## I.  BACKGROUND

On November 4, 2003, the Department filed a one-count administrative complaint against

Morgan, a licensed clinical psychologist, alleging that he engaged in unethical, unauthorized, or

unprofessional sexual conduct during his treatment of a female patient, E.S. The complaint

averred that Morgan's conduct constituted grounds for suspension of his "certificate of

registration" pursuant to section 15(7) of the Clinical Psychologist Licensing Act (225 ILCS

15/15(7) (West 2002)). Concurrent with its complaint, the Department filed a petition with the director of the Department, Fernando E. Grillo (Director), to suspend Morgan's license.

On the same day that the Department filed its complaint, the Director held a telephonic proceeding in which the Department's attorney questioned William Disselhorst, a health service investigator for the Department. Disselhorst testified regarding interviews he conducted with E.S. and Morgan, as well as his examination of Morgan's office/residence.

Director Grillo then issued an order, dated November 4, 2003, suspending Morgan's license to practice as a clinical psychologist pending proceedings before the Clinical Psychologist Licensing and Disciplinary Board of the State of Illinois (Board). The Director found that "public interest, safety and welfare imperatively require[d] emergency action to prevent the continued practice of Clinical Psychology by [Morgan].

The Department filed an amended administrative complaint on November 26, 2003, to include additional charges of gross negligence in relation to Morgan's behavior toward E.S., and to allege unprofessional conduct and gross negligent in relation to three other clients of Morgan: J.P., D.M., and L.L. On December 2, 2003, Morgan filed a motion *in limine* to exclude the allegations concerning J.P., D.M. and L.L. An administrative law judge (ALJ) ruled to allow only the allegations of E.S. and L.L. to proceed. On December 10, 2003, the Department filed a second amended complaint that additionally alleged that Morgan violated the confidentiality of E.S. and E.S.'s husband by discussing each spouse's individual sessions with the other.

An evidentiary hearing regarding Morgan's summary suspension commenced on December 4, 2003, before an ALJ and continued on December 5, 11, 12, and 15, 2003. Counsel

for the Department and counsel for Morgan participated in the hearing and a member of the Board was present on December 4 only.

At the hearing, the Department first called E.S. to testify. E.S. stated that she and her husband were referred to Morgan for marriage counseling through her husband's insurance company. She had roughly five meetings with Morgan. E.S. described that her first meeting with Morgan was on July 16, 2003, at 10:30 p.m. She explained that she was scheduled to have an appointment on July 17, 2003, but that on the July 16, she had a fight with her husband and had him arrested. She then called Morgan, who suggested that she come for a session that evening.

E.S. described that her sessions were conducted in Morgan's home, in an office to the right of the front door. However, on August 4, 2003, her fourth or fifth session, E.S. went to Morgan's residence at 12:30 p.m., and Morgan had her go to a second-floor room to listen to a relaxation tape. The room was to the left at the top of the stairs, there was a recliner and a "desk chair" in the room, and the room was "very dark." E.S. stated that Morgan had her sit in the recliner and showed her that the chair had heating and vibrating mechanisms. Morgan reclined the chair for E.S. and turned on the heating and vibrating mechanisms. He then played the relaxation tape, which contained a woman's voice instructing the listener to close her eyes, to take deep breaths, and to sit in certain positions. E.S. stated that she initially felt relaxed and comfortable, that she "felt like I was being put into a trance," and that she could "go into a sleep, almost like a hypnotic state."

E.S. then described that Morgan placed his hand just above her right ankle and ran his

hand up her shin, stopping at her knee. He then ran his hand all the way up her leg and she told him to "please stop it" and he said "okay." After a minute or two, Morgan rubbed her abdomen, lifted her shirt and ran his hand across her stomach on her bare skin and up her chest. She again told him to stop and he did. After another minute or two, Morgan left the room to answer a telephone call. When he returned , he put his hand on E.S.'s leg again, ran his hand up her leg, under her underwear, and put his finger in her vagina. E.S. said that she told him to stop, that he did stop, and that the telephone then rang again. After Morgan returned from the second phone call, E.S. stated that he put his hand on her stomach, lifted her shirt, pulled up her bra, and began sucking her right breast. E.S. said that she told Morgan to stop because she was "extremely uncomfortable."

E.S. described that at about this time, the relaxation tape finished and Morgan told her he had to go downstairs for a 2 p.m. appointment. He whispered something in her ear, but she did not understand what he said. Morgan then told E.S. that she could stay in the room to get herself together or listen to the tape again. E.S. stated that when Morgan left the room she jumped up, looked around the room, and then walked down the stairs. She described that she was upset but was trying to keep her composure. E.S. said that Morgan was already with his next client, a "blonde woman," and that she (E.S.) apologized for interrupting, got her things, and left the house.

E.S. testified that after leaving Morgan's residence she immediately called her friend, Donna Harrington, and told her that "something just happened." E.S. said that she did not want to talk about it over the telephone, so she drove around for a while and then went to Harrington's

4

house. E.S. then told Harrington, who had been a police officer in Lithuania, what had happened.

E.S. stated that she then called a rape crisis hotline and was advised to go immediately to a hospital rather than to a police department. E.S. said that, at around 8 p.m., she went to Silver Cross Hospital, where emergency room doctors performed a "partial rape kit" examination. E.S. spoke with police officers at the hospital. She also met with Detective Richard Ackerson.

Finally, when asked why she did not get out of the chair when Morgan first touched her, E.S. stated:

"I ask myself that every day because this was – I was – I trusted this man and I was almost put into a hypnotic state in my opinion of the way the whole room was set up, the way the tape was played. I was scared. And I don't know why. I never – this has never happened to me and I don't know why I did not get up and run. I don't know."

The Department next called Investigator Disselhorst, who stated that his job with the Department was to conduct investigations of complaints against professionals. Disselhorst said that prior to working for the Department, he was a Chicago police officer for 32 years. Disselhorst described that in March of 2003, he interviewed Morgan at his home in relation to L.L.'s allegations. Disselhorst described that, in Morgan's home/residence, there was an office with glass doors to the right of the front door. He also reported that Morgan said that there was a "respite room" on the second floor. Morgan initially said that Disselhorst could not see the respite room because his wife was ill and was relaxing there, but when Disselhorst insisted,

5

Morgan took him there. Disselhorst described that he observed the "respite room" for less than a minute or two, but said that it was at the top of the stairs and contained a recliner chair that was dark brown or, possibly, burgundy in color. Disselhorst said that Morgan's wife was in the chair so he was unable to further inspect it to see if it had heating or vibrating mechanisms. Disselhorst said that Morgan denied using the room for clients but then admitted that he had met with L.L. there when his wife was home during one session.

Disselhorst testified that he conducted a telephone interview with E.S. on November 3, 2003. He said that E.S. had difficulty discussing Morgan's treatment of her, that her voice was cracking as she spoke, and that she was emotional. Disselhorst said that E.S. told him that she was in the upstairs room at Morgan's residence on her last visit and that Morgan touched her legs, stomach, and vagina, and had placed his lips on her breast during the playing of the relaxation tape. Disselhorst stated that he believed what E.S. had told him because "she described the [respite room] in detail to the point where it fit the observations I had made when I was in the room."

Disselhorst stated that he spoke with E.S.'s friend, Harrington, on the telephone and referred to her as an "outcry witness," meaning the person to whom a victim first goes to for help or support. Disselhorst stated that he thought Harrington was credible and that she validated the information E.S. had provided to him.

The Department next called Richard Ackerson, a detective with the Will County sheriff's department. Ackerson stated that he interviewed Morgan in February of 2003 regarding L.L.'s allegations. Ackerson stated that he also met with E.S. after her last appointment with Morgan

and that she described what had transpired. His description of what E.S. told him was similar to E.S.'s in-court testimony.

The Department also called Michelle James, a licensed clinical psychologist, as an expert witness. Dr. James testified that she thought Morgan violated provisions of the Illinois Clinical Psychology Licensing Act and the American Psychological Association Code of Conduct based on his unethical touching of E.S. Dr. James stated that Morgan violated E.S.'s trust and exploited her. She described that clients, such as E.S., who have been involved in physical altercations with a spouse, are vulnerable and under considerable stress and will have a lesser capacity to make good judgments. Dr. James averred that, due to E.S.'s vulnerability, Morgan was in a position of much greater power and that this situation lead to E.S.'s difficulty in removing herself from the situation. Dr. James also averred that although she did not believe that the relaxation tape put E.S. into hypnotic state, E.S. was at another level of consciousness, which may have lessened her ability to react.

Dr. James stated that psychotherapy does not include touching a client, that it is not customary to have an initial session at 10:30 p.m., and that a home office blurs the boundaries between what is professional and what is outside of that realm, especially when the client sits in a heated, vibrating chair in an upstairs room of the house. Finally, Dr. James testified that she thought E.S.'s testimony was consistent with the written accounts of what occurred.

The Department next called J.P., who testified that she saw Morgan on the afternoon of August 4, 2003, for a therapy session. J.P. stated that when Morgan opened the door for her, she saw a woman at the top of the landing descending the stairs from the second floor. J.P. went in

the first-floor office and sat down.  The woman then came in the office, grabbed some belongings, and apologized for interrupting the session.  J.P. described the woman as "a little disoriented" and "shaky," and said that the woman "kept apologizing that she was interrupting my time and she would be out of the way and she kind of just left like she was frazzled."

The Department then called Morgan as an adverse witness.  He denied that E.S was ever in the second-floor "respite room" or that he had her listen to a relaxation tape on her last visit.  He admitted that he has a reclining chair in the respite room, but he denied that it had heating or vibrating mechanisms.  He admitted that he saw a client, J.P., on August 4, 2003, after seeing E.S., but he denied that E.S. was ever in the upstairs room of his house.  He stated that when J.P. entered the home and went into the first floor office, E.S. was in the first-floor bathroom.  He admitted that E.S. came into the office while J.P. was there and that she apologized for interrupting.  Morgan denied ever touching E.S. in the ways described in the Department's complaint or as testified to by E.S.

The Department next called Mary Morgan, Morgan's wife.  Mary testified that there are two recliners in her house: a green chair that has no heating or vibrating element, and a dark red chair that has both heating and vibrating controls in the right armrest.  Mary testified that, "at this moment," the green chair was in the respite room and the red chair was in the first-floor family room.  She stated that the red recliner was moved out of the respite room in the middle of June of 2003.  She said she rests in the respite room due to her non-Hodgkins lymphoma, and that the red chair was moved because she does not like it.

The ALJ issued her "report and recommendation" on March 31, 2004.  In her report she

stated that she received the complete record of the proceedings on January 27, 2004. In the "findings of fact" section of the report, the ALJ recounted E.S.'s testimony and then stated: "E.S. appeared to be a polite and respectful person. Her testimony was fairly consistent and detailed. Overall, she was sincere and was a believable and credible witness." Similarly, the ALJ recounted the testimonies of J.P., Inspector Disselhorst, and Detective Ackerson, finding them all to be credible witnesses. The ALJ found Dr. James to be a qualified and articulate expert witness and gave her opinions "substantial weight."

With regard to Morgan's testimony, the ALJ stated:

"Respondent was not a credible witness. He appeared to be unruly in the courtroom at times by blurting out utterances when other individuals were talking. For example, Respondent admitted to maybe having said, 'bullshit.' Also, Respondent would make dismissive faces, frowns, roll his eyes and shake his head when other witnesses testified. Respondent's courtroom demeanor clearly suggested that perhaps he was not respectful of other people, which was basically alleged through the Department's allegations of unprofessional conduct with E.S."

With regard to the testimony of Mary, the ALJ stated: "At times, it appeared Mrs. Morgan had a slightly blasé and slightly sarcastic demeanor in answering questions. Her testimony seemed only to try and bolster her husband's case and her testimony was not strong."

The ALJ then found that the Department failed to prove by clear and convincing evidence gross negligence with regard to E.S., unethical conduct and gross negligence with regard to L.L., and breach of confidentiality with regard to E.S. and her husband. However, the ALJ found that

9

the Department did prove by clear and convincing evidence that Morgan had violated section 15(7) of the Clinical Psychologist Licensing Act (225 ILCS 15(7) (West 2004)) by engaging in unethical, unauthorized, or unprofessional conduct with regard to his treatment of E.S.

Based on her findings of fact and conclusions of law, the ALJ recommended that Morgan's license be suspended for 60 days, that Morgan be placed on probation for one year, and that Morgan complete 12 hours of continuing education in ethics.

On May 11, 2004, Morgan filed a motion for a temporary restraining order against the Department and the Director. On June 29, 2004, the chancery court granted Morgan's motion, stating in its written order:

"1. [The Director] issued an order which imposed a summary suspension on the clinical psychologist license held by Russell Morgan, Plaintiff, on November 4, 2003.

2. The summary suspension was issued under the terms of Clinical Psychologist Licensing Act, 225 ILCS 15/1 et seq., which provides a summary suspension may be issued if the Director finds that evidence in the possession of the Director indicates that the continuation of practice by the clinical psychologist would constitute and imminent danger to the public.

3. An administrative hearing on the summary suspension was conducted in December of the year 2003.

4. As of June 28, 2004, no recommended decision has been rendered by the [Board] and no final administrative decision has been rendered by the

[Department.]

5. Plaintiff has asserted a claim based upon his right to practice his profession as a psychologist.

6. Based upon the summary suspension of the Plaintiff's license as a psychologist being imposed on November 4, 2003 and no decision having been rendered as of the date of this order, the Court has weighed the risk between the parties of imposing a summary suspension, based upon the principles set out by the Illinois Supreme Court in the case of Lyon v. Department of Children and Family Services, 209 Ill. 2d 264, 807 N.E.2d 423 (2004).

7. The Court finds there is a sufficient basis for finding that the Plaintiff has established a likelihood of success on the merits based upon a violation of due process resulting from the delay in rendering a decision on the summary suspension within a reasonable time after the post-suspension hearing. The balance of the harms weighs in favor of the Plaintiff.

8. The Court finds that Plaintiff has no adequate remedy at law because he has been prevented from practicing his profession since November 4, 2003, without a decision on the summary suspension within a reasonable time after the post-suspension hearing.

9. The Court finds that Plaintiff suffers an irreparable injury in being prevent[ed] from practicing his profession without a decision on the summary suspension within a reasonable time after the post-suspension hearing.

11

10. A temporary restraining order should be granted as prayed, restraining and enjoining the Defendants, their agents, employees and those in active concert or participating with them form continuing the summary suspension of the license of Russell Morgan, Plaintiff, as a psychologist, based upon the findings set out above."

On dates spanning from July 8 through August 13, 2004, the chairman and four other members of the Board signed two documents: the first entitled "Rational for Deviation for the Recommendations Issued by Administrative Law Judge," and the second entitled "Findings of Fact, Conclusions of Law, and Recommendation to the Director." In these documents, the Board adopted the ALJ's findings of fact and conclusions of law but stated that the serious nature of Morgan's actions called for stronger penalty. The Board recommended that Morgan be given a 90-day suspension, indefinite probation with a minimum of two years subject to several conditions, including that he be prohibited from treating individual female clients for the initial six months of his probation.

In response to the Board's recommendation, Morgan filed a motion for rehearing, asking the Director to consider, among other things, a report from the Illinois State Police that was not available at the hearing and which showed no indication of saliva on E.S.'s breast or her underwear. Some five months later, on January 28, 2005, the Director issued a decision denying rehearing and adopting the Board's recommendations. However, the Director noted that the 90-day suspension would be considered served by the previous summary suspension. Thereafter, Morgan filed a complaint for administrative review in the circuit court, and on September 20,

No. 1-06-0266

2005, the circuit court affirmed the Director's decision. The court subsequently denied Morgan's motion for reconsideration. Morgan then brought this appeal.

On appeal, Morgan asks us to reverse the Director's final administrative decision. He contends that Clinical Psychologist Licensing Act is unconstitutional because it gives the Director unfettered authority to impose a summary suspension without providing any guidelines as to what constitutes an imminent danger to the public or what quality of evidence will support such a determination. Morgan also contends that the Act is unconstitutional because once a summary suspension is imposed, there is no definite time frame in which the Department must reach its ultimate decision. Morgan further contends that, even if the Act is constitutional, the Department violated his right to a prompt determination following the hearing on the summary suspension. Morgan also argues that the Director should have granted a rehearing because E.S.'s hospital records, including the partial rape kit, were not available at the time of the original hearing. Morgan next contends that the ALJ made incorrect findings with respect to the credibility of witnesses at the hearing. Finally, Morgan contends that following the ALJ's issuance of her report and recommendation, the Board held an improper proceeding off the record in which it determined to provide a recommendation to the Director different from that suggested by the ALJ.

The Department contends that the Department's decision to impose a suspension on Morgan was amply supported by the evidence adduced at the hearing. The Department further contends that Morgan's complaints regarding his summary suspension are moot because that suspension ended when the chancery court issued a temporary restraining order in June of 2004.

13

However, even if not moot, the Department contends that the Act is not unconstitutional and that no due process violations occurred.

## II. ANALYSIS

The Clinical Psychologist Licensing Act (Act) is subject to judicial review in accordance with the Administrative Review Law. See 225 ILCS 15/22 (West 2004); 735 ILCS 5/3-101 *et seq*. (West 2004). The Administrative Review Law provides that our review extends to all questions of law and fact presented by the entire record; that we may not hear new or additional evidence; and that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2004). Thus, we may not substitute our judgment for that of the administrative agency, but must ascertain whether the findings and decisions of the agency are against the manifest weight of the evidence. Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992). An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident; if the record contains evidence to support the agency's decision, it should be affirmed. Abrahamson, 153 Ill. 2d at 88, 606 N.E.2d at 1117.

### A. Nonconstitutional Arguments

We first address Morgan's nonconstitutional arguments. Morgan contends that the Director erred in refusing to grant him a rehearing to consider the results of the partial rape kit, which showed no indication of saliva on E.S. or her underwear. According to Morgan, his guilt was determined solely on the basis of E.S.'s word against his, and that, in light of the exculpatory

evidence of the partial rape kit, E.S.'s version of the events could not be considered clear and convincing. We disagree.

Section 15.4 of the Act states: "Whenever the Director is satisfied that substantial justice has not been done in a hearing for *** suspension, *** he or she may order a rehearing by the same or another hearing officer or Board." 225 ILCS 15/15.4 (West 2004). Thus, whether to grant a rehearing is solely within the discretion of the Director. See People ex rel. Goldfarb v. White, 54 Ill. App. 2d 483, 490, 203 N.E.2d 599 (1964). Generally, courts should grant a new trial on account of newly discovered evidence where it is apparent or likely that it might change the result upon retrial. Baldridge v. Department of Registration & Education, 52 Ill. App. 3d 568, 574, 367 N.E.2d 95 (1977). Here, however, even if the results of the partial rape kit were available at Morgan's hearing, it is not apparent or likely that the result would have been different. The fact that no evidence of saliva was found in the partial rape kit does not clearly impeach E.S's testimony that Morgan placed his mouth on her breast. Further, there is no indication in the record of the likelihood of finding evidence of saliva under such circumstances as testified to by E.S., where a mouth is placed on a breast and then a partial rape kit is performed some six hours later. See Ray v. Department of Registration & Education, 94 Ill. App. 3d 1123, 1127, 419 N.E.2d 413, 416 (1981), quoting Ill. Rev. Stat. 1977, ch. 111, par. 6915 (The party seeking a rehearing "bears the burden of stating and proving 'the particular grounds therefor' "). The Director was therefore free to conclude that the evidence adduced at the hearing was sufficient to support the ALJ's findings despite the fact that the partial rape kit did not corroborate E.S.'s testimony. Accordingly, we cannot say that the Director abused his discretion

15

No. 1-06-0266

in determining that substantial justice had been done at Morgan's hearing despite the absence of the partial rape kit results.

Morgan next contends that the ALJ made improper evidentiary and credibility determinations. First, Morgan contends that the ALJ disregarded inconsistencies in E.S.'s testimony and other witnesses' contradictions of E.S.'s version of the facts. Specifically, Morgan points out that E.S. testified at the hearing that Morgan inserted a finger into her vagina, while the hospital report indicates that she stated that Morgan touched her external vagina but that she was unsure whether there was any penetration. Morgan also points out that J.P.'s description of E.S.'s height was inaccurate, that J.P and E.S. disagreed whether they were ever face to face, and that J.P. was inconsistent in testifying both that E.S. was coming down the stairs when J.P. first entered Morgan's residence and that she had already started her session when E.S. first came down.

Although these inconsistencies are apparent in the record, we cannot say that the Department erred in resolving these inconsistencies in favor of E.S. See People v. Soteras, 295 Ill. App. 3d 610, 621, 693 N.E.2d 400, 407 (1998), quoting People v. Talach, 114 Ill. App. 3d 813, 820 (1983) (" 'Minor inconsistencies in the testimony of *** witnesses do not destroy the credibility of these witnesses, and any variations in testimony were for the trier of fact to weigh' "). Moreover, it is not our function to reevaluate witness credibility or resolve conflicting evidence. Ulysse v. Lumpkin, 335 Ill. App. 3d 886, 893, 781 N.E.2d 415, 420 (2002). As noted, we may not substitute our judgment for that of the administrative agency on questions of fact. Abrahamson, 153 Ill. 2d at 88, 606 N.E.2d at 1117.

16

No. 1-06-0266

Morgan next contends that the ALJ erred in allowing other witnesses to give their opinions as to E.S.'s credibility. Specifically, Morgan notes that when Department Investigator Disselhorst was asked whether he had any reason not to believe what E.S. told him at their interview, Disselhorst stated that her description of the respite room fit his observations of the room. Morgan now contends that the ALJ improperly allowed this testimony; however, Morgan did not object to this testimony at the hearing and we, therefore, deem Morgan's contention waived without examining its merits. See People v. Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois, 217 Ill. 2d 481, 503-04, 841 N.E.2d 928, 941 (2005) ("If a party wishes to challenge the admissibility of testimony, it is that party's duty to object in apt time to obtain a ruling by the trial court. 'Failure to object must be considered as waiver of the objection.' [Citations.]").

Morgan also contends that the ALJ improperly allowed the Department's expert witness, Dr. James, to testify about E.S.'s credibility. Specifically, Morgan notes that during the Department's direct examination of Dr. James, she testified: "[E.S.'s] ability to generally report her experience matched the documentation that I've reviewed. Because there was consistency, general consistency in those two pieces of data, it gave me reason to believe that the information she provided was reliable and true and accurate." Morgan contends that this testimony (which he did object to at the hearing) was improper in that consisted of personal opinion or an observation of specific acts. However, in support, Morgan cites authority dealing with the impeachment of witnesses through testimony regarding their reputation. See Ill. L. & Prac., Witnesses, §162, at 166 (West 2006) ("In order to impeach a witness for poor reputation for truth and veracity, a

17

No. 1-06-0266

proper foundation must be laid"); People v. Anderson, 337 Ill. 310, 332, 169 N.E.2d 243 (1929) ("On cross-examination or in rebuttal of proof of good character particular acts of misconduct may not be shown").

Contrary to Morgan's characterization, analytically, the instant facts do not involve impeachment through testimony of a bad reputation for truth and veracity; rather, they arguably involve the Department's attempt to bolster E.S.'s testimony through the opinion of Dr. James with regard to E.S.'s veracity. Thus, Morgan's contention lacks citation to proper authority. Nevertheless, we note the general evidentiary rule that where character evidence is properly in issue, it can only be shown through reputation, not through personal opinion. See Ill. L. & Prac. Witnesses, §71 (West 2006); People v. Goodwin, 98 Ill. App. 3d 726, 730, 424 N.E.2d 425, 428 (1981) ("In Illinois, a witness is not allowed to give a personal assessment of another's character"); McCleary v. Board of Fire & Police Commissioners of the City of Woodstock, 251 Ill. App. 3d 988, 997, 622 N.E.2d 1257 (1993). The ultimate conclusion as to whether a witness testifies truthfully is a determination left exclusively to the trier of fact. See People v. Chitwood, 148 Ill. App. 3d 730, 738, 499 N.E.2d 992, 998 (1986) ("Since it is the jury's function to determine the credibility of witnesses, asking Bingheim if he thought McQueen was lying when he reported the incident was improper"); People v. Hyche, 91 Ill. App. 3d 559, 565, 414 N.E.2d 1142, 1146 (1980) ("questioning [a] defendant [about other witnesses' veracity] is improper as it clearly invades the province of the jury to determine which witnesses are telling the truth where there is conflicting testimony. However, we are not convinced such error constitutes reversible error"). Thus, considering the general rules of evidence, it would appear that Dr. James's

18

testimony that E.S.'s in-court testimony was "reliable and true and accurate" was improperly admitted.

However, an administrative agency's "failure to observe the technical rules of evidence shall not constitute grounds for the reversal of the administrative decision unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him or her." 735 ILCS 5/3-111(b) (West 2004); Lloyd A. Fry Roofing Co. v. Pollution Control Board, 20 Ill. App. 3d 301, 311, 314 N.E.2d 350, 358 (1974) ("Although we agree that incompetent evidence was admitted into evidence *** we are not compelled to conclude that substantial unfairness or an overall denial of justice resulted. *** The admission of incompetent evidence is not reversible error if there is substantial evidence to sustain the decision of the Board. [Citation.]"). We cannot say such is the case here. There was ample evidence apart from Dr. James's arguably inappropriate testimony that E.S. was telling the truth. The ALJ found E.S. to be a credible witness in her own right and Morgan and his wife to be less than credible; E.S.'s testimony regarding the respite room was corroborated by Investigator Disselhorst; E.S.'s testimony that she was upstairs in Morgan's home was corroborated by J.P.; Investigator Disselhort's testimony regarding what E.S.'s friend Harrington was consistent with E.S.'s testimony; and Detective Ackerson's recounting of what E.S. told him was consistent with what E.S. testified to in court. Moreover, the same result ensues if we examine the issue for harmless error. See Central Illinois Electrical Services, L.L.C. v. Slepian, 358 Ill. App. 3d 545, 550, 831 N.E.2d 1169, 1173 (2005) ("If the outcome of [a] case would not have been different, a judgment or decree will not be disturbed").

19

Morgan further contends that the ALJ improperly considered his courtroom behavior in determining his credibility. As noted, in her report, the ALJ stated that Morgan was "not a credible witness"; that "he appeared to be unruly in the courtroom at times by blurting out utterances when other individuals were talking", that he said "bullshit" during another witness's testimony; and that he "would make dismissive faces, frowns, roll his eyes and shake his head when other witnesses testified." The ALJ further stated that Morgan's "courtroom demeanor clearly suggested that perhaps he was not respectful of other people, which was basically alleged through the Department's allegations of unprofessional conduct with E.S." Morgan contends that these observations were improperly considered by the ALJ in making her determination; however, Morgan cites no cases in support of his position and we, therefore, are not compelled to consider the issue further. See 188 Ill. 2d R. 341(e)(7).

Nevertheless, we find on the merits that the ALJ's observations were not improper. Although in-court demeanor, as opposed to demeanor while on the witness stand, is generally not considered to be high quality evidence of credibility (see 1 J. Wigmore, Wigmore on Evidence §274, at 558 (2d ed. 1923), such evidence may still be considered by the trier of fact (see State of Wisconsin v. Joseph J.H., 267 Wis. 2d 962, 671 N.W.2d 718 (2003) (finding it not inappropriate for the court in a bench trial to consider the general courtroom demeanor of defendant while off the witness stand as indicative of credibility)). However, a distinction is made as between a defendant who testifies and thereby puts his character and credibility in issue, and one who invokes his fifth amendment right not to testify. As stated in U.S. v. Schuler, 813 F.2d, 978, 981 (9th Cir.1987):

"Unless and until the accused puts his character at issue by giving evidence of his good character or by taking the stand and raising an issue as to his credibility, the prosecutor is forbidden to introduce evidence of the bad character of the accused simply to prove that he is a bad man likely to engage in criminal conduct. ***

This basic principle cannot be circumvented by allowing the prosecutor to comment on the character of the accused as evidenced by his courtroom behavior. [Citation.]" Schuler, 813 F.2d at 981 n.3.

On the other hand, "when a defendant chooses to testify, a jury must necessarily consider the credibility of the defendant. In this circumstance, courtroom demeanor has been allowed as one factor to be taken into consideration." Schuler, 813 F.2d at 981. Here, Morgan testified on his own behalf and denied that he engaged in any improper conduct with regard to his treatment of E.S. Thus, his credibility was clearly in issue, and the ALJ was not in error to take note of his demeanor while sitting in the courtroom.

Morgan next contends that the Board held an improper *ex parte* hearing prior to its decision to adopt the ALJ's findings but recommend that Morgan be given a longer suspension. As evidence of this alleged *ex parte* hearing, Morgan cites to the Board's "Rationale for Deviation form the Recommendation Issued by the Administrative Law Judge" (Rationale for Deviation) in which it is stated:

"Now comes [Board] of the Illinois Department of Professional Regulation, after conducting a hearing and reviewing the record in this matter, and a majority of its members having made the attached Findings of Fact, Conclusions of Law and

21

> Recommendation to the Director, the Board attaches this document its reasons [*sic*] for the deviation from the Recommendation of [the ALJ], dated March 31, 2004."

According to Morgan, the reference to a hearing in the above sentence and the fact that the Board adopted only the findings of the ALJ, but not her recommendation, must mean that the Board conducted its own proceeding where the ALJ's report was considered and alternative recommendations were made. Morgan contends that excluding him from such a hearing was a violation of his rights requiring reversal.

The Department contends that the hearing referred to in the Board's Rationale for Deviation was, in fact, the hearing held before the ALJ in December where Morgan was present. The Department further contends that any deliberations the Board may have conducted do not constitute improper *ex parte* communication. We find Morgan's contentions unsupported by the record. The only evidence of an *ex parte* hearing comes from the Board's Rationale for Deviation. However, the sentence could just as easily be interpreted as referring to the hearing before the ALJ, since that hearing was conducted through the authority of the Department, of which the Board is an integral part. Absent further evidence that an improper hearing was conducted, we must reject Morgan's contention. See Ray, 94 Ill. App. 3d at 1127, 419 N.E.2d at 416 ("Absent some competent evidence of such [an *ex parte*] communication and more importantly, that such a communication entered into the committee's deliberative process, a court cannot speculate on the matter"); Solomon v. City of Evanston, 29 Ill. App. 3d 782, 787, 331 N.E.2d 380, 384-85 (1975) ("This court will not reverse on speculation and conjecture. Any

22

doubt arising from the incompleteness of the record will be resolved against the appellant. [Citation.] It is established that on appeal the party claiming error has the burden of establishing any irregularities, and one who seeks to reverse a decree carries the burden of showing that it is erroneous").

B. Constitutional/Due Process Arguments

In a series of undifferentiated arguments, Morgan attempts to attack the constitutionality of the Act and the constitutionality of the Department's delay in resolving his summary suspension. Although not clearly delineated or categorized in his brief, Morgan appears to raise several separate contentions. First, he appears to contend that the section 21.6 of the Act, which provides that the Director can impose a summary suspension in the event of imminent danger, is unconstitutionally vague and indefinite in that it does not define what constitutes an imminent danger so as to provide specific guidelines for when a summary suspension can be deployed. Morgan next seems to contend that the Act violates due process insofar as it permits a summary suspension to be predicated on unilateral and minimal evidence submitted before the accused clinical psychologist has an opportunity to respond. Finally, Morgan argues that the Act is violative of due process because it does not impose a time limit on the Department for the issuance of a final determination following a summary suspension and, thus, permits the summary suspension to linger indefinitely.

When examining the constitutionality of legislation, we start with a presumption that a statute is constitutional. Maun v. Department of Professional Regulation, 299 Ill. App. 3d 388, 396, 701 N.E.2d 791, 798 (1998). The party challenging the statute bears the burden of "clearly

establishing that the statute is unconstitutional." Rehg v. Department of Revenue, 152 Ill. 2d 504, 512, 605 N.E.2d 525, 529 (1992) overruled on other grounds by Wilson v. Department of Revenue, 169 Ill. 2d 306, 662 N.E.2d 415 (1996). We review questions of constitutionality *de novo*. Schultz v. Lakewood Electric Corp., 362 Ill. App. 3d 716, 720, 841 N.E.2d 37, 42 (2005).

### 1. Morgan's Vagueness Challenge

With regard to Morgan's apparent contention that the summary suspension section of the Act is unconstitutionally vague and indefinite, we note that "[a] statute's terms must be explicit enough to serve as a guide to those who must comply with it," but "mathematical certainty is not required." Maun, 299 Ill. App. 3d at 397, 701 N.E.2d at 798. A statute violates constitutional principles for vagueness only where " 'its terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts.' " Stern v. Northwest Mortgage, Inc., 179 Ill. 2d 160, 168, 688 N.E.2d 99, 103 (1997), quoting People v. Burpo, 164 Ill. 2d 261, 266, 647 N.E.2d 996 (1995). A statute will not be deemed unconstitutionally vague "merely because one could imagine hypothetical situations in which the meaning of some terms might be called into question." Maun, 299 Ill. App. 3d at 397, 701 N.E.2d at 798. "A statute will be considered unconstitutionally vague on its face only where it is incapable of any valid application in the sense that no standard of conduct is specified at all." Burpo, 164 Ill. 2d at 266, 647 N.E.2d 996. Here, the section of the Act in question, section 21.6 states:

"The Director may summarily suspend the license of a clinical

psychologist without a hearing, simultaneously with the institution of proceedings

24

No. 1-06-0266

for a hearing provided for in Section 16 of this Act, if the Director finds that evidence in the possession of the Director indicates that the continuation of practice by the clinical psychologist would constitute an imminent danger to the public. In the event that the Director summarily suspends the license of an individual without a hearing, a hearing must be held within 30 days after the suspension occurred." 225 ILCS 15/21.6 (West 2002).

Although "imminent danger" is not specifically defined in the Act, the term is sufficiently precise to guide the Director in performing his duties under section 21.6. The word "imminent" is defined as "[n]ear at hand; *** close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand, something to happen upon the instant, close although not yet touching, and on the point of happening." Black's Law Dictionary 750 (6th ed. 1990); see also New American Webster Dictionary 235 (1972) (defining the term as "likely to occur soon, impending"). The word "danger" is defined as "[j]eopardy, exposure to loss or injury; peril. Black's Law Dictionary 393 (6th 1990), see also New American Webster Dictionary 120 (1972) (defining "danger" as "exposure to injury, loss, pain, or other evil"); Black's Law Dictionary 750 (6th ed. 1990) (defining "imminent danger" as "such an appearance of threatened and impending injury as would put a reasonable and prudent man to his instant defense").

Thus, the term "imminent danger" is not "so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts." Burpo, 164 Ill. 2d at 266, 647 N.E.2d 996. The Director was sufficiently informed by

25

section 21.6 that he could impose a summary suspension only where the continued practice of a clinical psychologist would pose some jeopardy to the public in the near future. The fact that the scope of the term "imminent danger" is subject to some interpretation and discretion does not mean that the Director was left with no cognizable standard. The Act merely leaves some discretion with the Director as to the parameters of "imminent" and "danger", such latitude does not render the statute unconstitutionally vague. As applied here, the Director was clearly acting within scope of his discretion in finding an indication of imminent danger with regard to Morgan's continued practice. The Director was presented with evidence that Morgan engaged inappropriate, nonconsensual sexual conduct with a female patient. Thus, allowing Morgan to continue to his practice, which presumably included seeing female patients on a regular basis, may well have constituted an imminent danger to those members of the public.

2. Morgan's Challenge of Summary Suspension Under the Act

Morgan also seems to contend that the summary suspension imposed on him pursuant to section 21.6 of the Act violated his right to due process in that the evidence relied on by the Director was minimal and *ex parte* in that it consisted solely of the telephonic testimony of Investigator Disselhorst regarding his interviews with E.S. and Morgan. However, the supreme court has found similar summary suspensions valid. In Barry v. Barchi, 443 U.S. 55, 61 L. Ed. 2d 365, 99 S. Ct. 2642 (1979), a New York law provided for the suspension of harness racing trainers upon a showing that the trainer's horse had been drugged prior to a race. Barry, 443 U.S. at 64, 61 L. Ed. 2d at 375, 99. S. Ct. at 2649. The Court noted:

"Unquestionably, the magnitude of a trainer's interest in avoiding suspension is

26

substantial; but the State also has an important interest in assuring the integrity of the racing carried on under its auspices. In these circumstances, it seems to us that the State is entitled to impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues, whenever it has satisfactorily established probable cause to believe that a horse has been drugged and that the trainer has been at least negligent in connection with the drugging."

Barry, 443 U.S. at 64, 61 L. Ed. 2d at 375, 99. S. Ct. at 2649.

The Court then determined that the State had, in fact, established probable cause to support the summary suspension by adducing the assertion of a testing official who had examined the horse. Barry, 443 U.S. at 65, 61 L. Ed. 2d at 375, 99. S. Ct. at 2649. "At the interim suspension stage," the Court noted, " an expert's affirmance, although untested and not beyond error, would appear sufficiently reliable to satisfy constitutional requirements." Barry, 443 U.S. at 65, 61 L. Ed. 2d at 375, 99. S. Ct. at 2649.

In this case, as in Barry, it is clear that Morgan's interest in maintaining his license to practice is substantial and is protected by the due process clause of the fourteenth amendment. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 543, 84 L. Ed. 2d 494, 503, 105 S. Ct. 1487, 1494 (1985) ("the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood"); Fusari v. Steinberg, 419 U.S. 379, 389, 42 L. Ed. 2d 521, 529, 95 S. Ct. 533, 539 (1975); Federal Deposit Insurance Corp. v. Mallen, 486 U.S. 230, 240, 100 L. Ed. 2d 265, 277-78. 108 S. Ct. 1780, 1787 (1988). However, the reliability of the evidence has to be measured

against the interim risk. Here, the evidence supporting summary suspension was at least as good as that in Barry, and the risk was arguably more serious. The evidence in Barry consisted of the unilateral testimony of a state official and, similarly, in this case, it consisted of the unilateral testimony of a Department investigator who testified to his interviews with E.S. and Morgan. However, while the risk in Barry had to do with maintaining the integrity of harness racing, the risk here involved sexual abuse of patients by their clinical psychologist. Thus, it would seem that if the imposition of a summary suspension was appropriate in Barry, it would likewise be appropriate in this case.

3. Morgan's Challenge to the Length of Time a Summary Suspension can be Imposed

Morgan's third and strongest argument centers around his contention that the Act is unconstitutional because it does not limit how long a summary suspension can be imposed before the Director must issue a final decision. Related to this argument, Morgan alternatively contends that even if the Act is not unconstitutional in this regard, the Department's implementation of the Act in delaying a final determination on his summary suspension violated his right to due process. We disagree with Morgan's contention that the Act, itself, is unconstitutional but agree that the Department violated his right to due process by not promptly reaching a final determination after the hearing.

With respect to the Act's constitutionality, Morgan contends that it falters in that it does not address how long the summary suspension can be sustained before the Department is required to reach a final determination. In this regard, we note that the section 21.6 of the Act requires a hearing to be held within 30 days after the imposition of a summary suspension, but it

28

does not address when the Department must issue a final decision after the required hearing. 225 ILCS 15/21.6 (West 2002). Similarly, section 16.1 of the Act describes some of the steps taken by the Department in reaching a final decision after a hearing, but it does not place any definite time limit on the Department's ultimate resolution of a summary suspension:

"[T]he Director shall have the authority to appoint any attorney duly licensed to practice law in the State of Illinois to serve as [a] hearing officer in any action for refusal to issue, renew or discipline a license. The hearing officer shall have full authority to conduct the hearing. The hearing officer shall report his or her findings of fact, conclusions of law, and recommendations to the Board and the Director. The board shall have 60 days after receipt of the report to review the report of the hearing officer and to present its findings of fact, conclusions of law and recommendations to the Director. If the Board fails to present its report within the 60 day period, the Director may issue an order based on the report of the hearing officer. If the Director disagrees with the recommendations of the Board or hearing officer, the Director may issued an order in contravention of the Board's report." 225 ILCS 15/16.1 (West 2002).

Notably, section 16.1 does not impose a time limit on when the hearing officer (the ALJ, in this case) must issue his or her report to the Board, and although it provides that the Board has 60 days after receiving the hearing officer's report to present its own report to the Director, it does not constrain the time available to the Director to issue a final decision.

In support of his position that this indefiniteness is unconstitutional, Morgan cites Barry,

where, as noted above, the Supreme Court held that the prehearing suspension of a horse trainer was not unconstitutional. However, after reaching that determination, the Supreme Court found that the New York statute involved in that case, "neither on its face nor as applied ***, assured a prompt proceeding and prompt disposition" with regard to the trainer's suspension. Barry, 443 U.S. at 66, 61 L. Ed. 2d at 376, 99 S. Ct. at 2550. The statute at issue in Barry specified that a licensed trainer was entitled to a hearing after a summary suspension, but did not specify when the hearing must occur. Barry, 443 U.S. at 60-61, 61 L. Ed. 2d at 372-73, 99 S. Ct. at 2647-48. The statute also gave the racing board up to 30 days to issue a decision after the hearing and stated that the suspension " 'shall remain in full force and effect' " pending the final determination. Barry, 443 U.S. at 62, 61 L. Ed. 2d at 373, 99 S. Ct. at 2647.. The Supreme Court noted:

"Once suspension has been imposed, the trainer's interest in a speedy resolution of the controversy becomes paramount ***. We also discern little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing. On the contrary, it would seem as much in the State's interest as [the trainer's] to have an early and reliable determination with respect to the integrity of those participating in state-supervised horse racing.

In these circumstances, it was necessary that [the trainer] be assured a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay. Because the statute as applied in this case was deficient in this respect, [the trainer's] suspension was constitutionally infirm under the Due

30

Process Clause of the Fourteenth Amendment." Barry, 443 U.S. at 62, 61 L. Ed. 2d at 376, 99 S. Ct. at 2650.

Morgan contends that this constitutional mandate, as articulated in Barry, that after a summary suspension, a hearing must be promptly held and determined without appreciable delay, is ignored by the Act and that the Act is, therefore, unconstitutional – a conclusion with which we disagree. Although not cited by either Morgan or the Department, we note that the Act adopts and incorporates by reference the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2004)). See 225 ILCS 15/15.2 (West 2004).[1]

Section 10-65(d) of the Administrative Procedure Act states in relevant part:

> "[N]o agency shall revoke, suspend, annul, withdraw, amend materially, or
> refuse to renew any valid license without first giving written notice to the licensee

---

[1]Section 15.2 of the Act states: "The Illinois Administrative Procedure Act is hereby expressly adopted and incorporated herein as if all of the provisions of that Act were included in this Act, except that the provision of subsection (d) of Section 10-65 of the Illinois Administrative Procedure Act that provides that at hearings the licensee has the right to show compliance with all lawful requirements for retention, or continuation or renewal of the license, is specifically excluded." 225 ILCS 15/15.2 (West 2004). Section 15.2 of the Act does not excluded section 10-65 of the Administrative Procedure Act in its entirety, but only the one specific provision. That provision appears in the Administrative Procedure Act as a discrete sentence and is nearly perfectly quoted in section 15.2 of the Act. We have replace that excluded provision with asterisks in our quotation of the section above.

31

of the facts or conduct upon which the agency will rely to support its proposed action and an opportunity for a hearing in accordance with the provisions of this Act concerning contested cases. *** If, however, the agency finds that the public interest, safety, or welfare imperatively requires emergency action, and if the agency incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. Those proceedings shall be *promptly instituted and determined*." (Emphasis added.) 5 ILCS 100/10-25(d) (West 2004).

Thus, despite Morgan's contentions to the contrary, the Act does, in fact, through its adoption and incorporation of the Administrative Procedure Act, address the time frame in which a summary suspension must be resolved by stating that the proceedings following a summary suspension "shall be promptly instituted and determined." In light of this requirement, it is clear that Morgan's constitutional challenge of the Act fails. Although not discussed by the parties, we find that the term "promptly" is not unconstitutionally vague. As stated in Black's, "[t]he meaning of the word [promptly] depends largely on the facts in each case, for what is 'prompt' in one situation may not be considered such under other circumstances or conditions. To do something 'promptly' is to do it without delay and with reasonable speed." Black's Law Dictionary 1214 (6th ed 1990), citing Application of Beattie, 4 Storey 506, 180 A.2d 741, 744 (1962); see also New American Webster Dictionary365 (1972) (defining "prompt" as "quick to act; given without delay; on time"). As with the term "imminent danger," as discussed above, the term "promptly" is not mathematically precise; nevertheless, the term is clearly capable of valid

32

No. 1-06-0266

application and, therefore, cannot be deemed facially unconstitutional. Burpo, 164 Ill. 2d at 266, 647 N.E.2d 996 ("A statute will be considered unconstitutionally vague on its face only where it is incapable of any valid application in the sense that no standard of conduct is specified at all").

Moreover, the term "promptly" is particularly appropriate in light of the fact that the requirements of due process are variable in nature. As described by the supreme court in Mathews v. Eldridge, 424 U.S. 319, 334, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 902 (1976), " ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' [Citation.] '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' [Citation.]" Thus, the flexibility in the term "promptly" does not make the term vague; rather, much like due process, what can be considered prompt will depend on the particular time, place, and circumstances involved.

In any event, Morgan also contends that, regardless of the facial constitutionality of the Act, the Department has violated his right to due process. Correspondingly, we must examine Morgan's contention that the Department was dilatory in the light of the Act's promptness requirement and, if such is the case, whether the Department's actions taken in violation of the Act are void.[2] It is undoubtedly Morgan's position that the ALJ was not prompt in taking three

_____

[2]We note that several cases have addressed whether statutory time frames imposed on administrative agencies are directory or mandatory – the distinction being that an agency's failure to conform with a directory time limit will not result in a loss of jurisdiction, while the failure to conform with a mandatory time limit will result in such a loss. See Shawgo v. Department of Children & Family Services, 182 Ill. App. 3d 485, 488-89, 538 N.E.2d 234, 236 (1989); Gunia v.

33

months to complete her report; that the Board was not prompt in taking the nearly 4 ½ months from March 31 to August 13, 2004, to complete its evaluation; and that the Director was not prompt in taking until January 28, 2005, nearly 15 months after the imposition of the summary suspension, to reach a final decision. While it is true that Morgan's summary suspension was

_____

Cook County Sheriff's Merit Board, 211 Ill. App. 3d 761, 768-69, 570 N.E.2d 653, 658 (1991); Stull v. Department of Children & Family Services, 239 Ill. App. 3d 325, 332, 606 N.E.2d 786, 791 (1992); S.W. v. Department of Children & Family Services, 276 Ill. App. 3d 672, 680, 658 N.E.2d 1301, 1307 (1995); Cavarretta v. Department of Children & Family Services, 277 Ill. App. 3d 16, 25-26, 660 N.E.2d 250, 256 (1996); Lehmann v. Department of Children & Family Services, 342 Ill. App. 3d 1069, 1079-80, 796 N.E.2d 1165, 1173 (2003). Thus, if an agency violates a mandatory time frame, subsequent orders of the agency would appear to be void. In such a case, the question of due process would not need to be reached. In this case, however, there does not appear to be any disparity between the promptness requirement of the Act and the due process requirements with respect to timing. As expressed in Barry, due process requires that a party "be assured a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay." Barry, 443 U.S. at 66, 61 L. Ed. 2d at 376, 99 S. Ct. at 2650; accord General Motors Corp. v. Motor Vehicle Review Board, 361 Ill. App. 3d 271, 836 N.E.2d 903 (2005); see also Loudermill, 470 U.S. at 547, 84 L. Ed. 2d at 507, 105 S. Ct. at 1496. ("The Due Process Clause requires provision of a hearing 'at a meaningful time.' [Citation.]"). Thus, it seems that what would be considered prompt under the Act would parallel what would be sufficient in terms of procedural due process.

terminated by operation of the temporary restraining order at the end of June of 2004, approximately eight months after it started, we must determine whether a summary suspension within that decreased time frame would be violative of the Act and due process.

Our supreme court addressed issues involving agency delay and procedural due process in Lyon v. Department of Children & Family Services, 209 Ill. 2d 264, 807 N.E.2d 423 (2004). In that case, the Department of Children and Family Services (DCFS), received a report that Lyon, a high-school teacher, had abused two students. Lyon, 209 Ill. 2d at 266, 807 N.E.2d at 428. Thereafter, pursuant to the Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.* (West 1998)), DCFS entered an "indicated report" of abuse into the state's central register and notified Lyon. Lyon, 209 Ill. 2d at 266, 807 N.E.2d at 428. Lyon appealed the indicated report and requested expungement of the report, but DCFS denied his request, concluding that the indicated finding was supported by credible evidence. Lyon, 209 Ill. 2d at 268, 807 N.E.2d at 428. Lyon then sought a hearing before an ALJ, which was the second stage of administrative appeal process provided for under the Abused and Neglected Child Reporting Act. Lyon, 209 Ill. 2d at 268, 807 N.E.2d at 428-29. After the hearing, the ALJ found that DCFS had not met its burden of showing that the indicated report was supported by the preponderance of the evidence with regard to one of the students, but that DCFS had met that burden with regard to the other student. Lyon, 209 Ill. 2d at 269, 807 N.E.2d at 429.

Lyon then filed for administrative review in the circuit court, and the circuit court reversed DCFS on the basis of discovery violations. Lyon, 209 Ill. 2d at 269, 807 N.E.2d at 429. DCFS appealed, and the appellate court affirmed on the grounds that DCFS had violated Lyon's

No. 1-06-0266

due process rights. Lyon, 209 Ill. 2d at 269, 807 N.E.2d at 429.

On DCFS's appeal to the Illinois Supreme Court, Lyon reiterated his previous arguments that the indicated findings were against the manifest weight of the evidence and that DCFS had violated his due process rights through various statutory and departmental procedural violations. Lyon, 209 Ill. 2d at 266, 807 N.E.2d at 427-28. After determining that the indicated findings were not against the manifest weight of the evidence, the supreme court acknowledged that Lyon had property and liberty interests in his ability to continue his profession, which were entitled to constitutional protections. Lyon, 209 Ill. 2d at 272, 807 N.E.2d at 431. The court noted:

" 'It is a well-established constitutional principle that every citizen has the right to pursue a trade, occupation, business or profession. This inalienable right constitutes both a property and liberty interest entitled to the protection of the law as guaranteed by the due process clauses of the Illinois and Federal constitutions.' " Lyon, 209 Ill. 2d at 272, 807 N.E.2d at 431, quoting Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton, 105 Ill. 2d 389, 397, 475 N.E.2d 536 (1985).

In examining whether DCFS had violated Lyon's due process rights, the court first determined that the director of DCFS had failed to meet a departmental 90-day deadline for the issuance of his decision by 27 days, and that he had also failed to meet an applicable statutory deadline that required him to issue his final decision within 45 days of the end of the hearing by 13 days. Lyon, 209 Ill. 2d at 276, 807 N.E.2d at 433.

The court then cited the United States Supreme Court's decision in Mallen, for the

36

factors to consider when determining whether a delay in the provisions of procedure offended due process. Lyon, 209 Ill. 2d at 276-77, 807 N.E.2d at 433. Those factors include: "the importance of the private interest and the harm to the interest because of the delay; the government's justification for the delay and its connection to the underlying government interest; and the likelihood that the interim decision may have been mistaken." Lyon, 209 Ill. 2d at 277, 807 N.E.2d at 433, citing Mallen, 486 U.S. at 242, 100 L. Ed. 2d at 269, 108 S. Ct. at 1788..

The court determined that both Lyon and DCFS had significant interests involved in the case – Lyon's interest being continued employment and DCFS's interest being the protection and welfare of children. Lyon, 209 Ill. 2d at 278, 807 N.E.2d at 434. Regarding the reasonableness of DCFS's delay, the court noted that the issue could not be resolved merely by comparing the length of the delay to delays in other cases, but that the standard of proof involved must also be considered. Lyon, 209 Ill. 2d at 278, 807 N.E.2d at 434. This consideration clearly implicates the third Mallen factor regarding "the likelihood that the interim decision may have been mistaken." Lyon, 209 Ill. 2d at 277, 807 N.E.2d at 433, citing Mallen, 486 U.S. at 242, 100 L. Ed. 2d at 279, 108 S. Ct. at 1788. The court explained:

"The standard of proof applied has a direct influence on the risk of erroneous judgments. When a higher standard of proof is applied, there is a reduced risk of finding an innocent person guilty and an increased risk of acquitting a guilty person. [Citation]. The applicable standard of proof in a particular proceeding, therefore, should be chosen based on a consideration of what balance of the risk of these two types of errors is appropriate under the

37

circumstances. [Citation.]"  Lyon, 209 Ill. 2d at 279, 807 N.E.2d at 434.

With regard to the standards of proof used in Lyon's administrative appeal, the court held:

"[T]he use of the credible-evidence standard to indicate a report and to consider a first-stage appeal does not automatically deprive a subject of due process because the second-stage appeal is conducted under the more stringent preponderance standard. [Citation.] By using a weaker standard of proof, the state is equipped to respond more quickly to allegations of abuse and neglect.  We find that it is constitutionally acceptable to place the entire risk of error, through use of the credible-evidence standard, on the subject for the finite period of the administrative appeal because the appeal is finally determined under the preponderance standard, which balances the risk of error equally.

Nevertheless, this distribution of the risk of error becomes problematic when the subject is not accorded a prompt appeal.  We conclude that it is constitutionally inappropriate to allow indicted reports based on credible evidence, with their damaging effects on subjects, to persist past the deadlines the General Assembly and [DCFS] itself decided to impose upon the administrative appeal process given the high risk of error inherent in the use of the credible-evidence standard."  Lyon, 209 Ill. 2d at 282, 807 N.E.2d at 436.

In this case, as in Lyon, the initial standard of proof employed by the Department in its determination to impose a summary suspension upon Morgan was far less stringent than the preponderance standard.  The Department's summary suspension of Morgan was wholly *ex parte,*

having been held without the participation of Morgan or his attorney, and it was based exclusively on the telephonic testimony of a Department investigator. No other evidence was heard or taken by the Director prior to his imposition of the summary suspension. As noted, section 21.6 of the Act provides that the Director can impose a summary suspension, if he "finds that evidence in [his] possession \*\*\* indicates that the continuation of practice by the clinical psychologist would constitute an imminent danger to the public." 225 ILCS 15/21.6 (West 2002). While, in Lyon, the statute and regulations themselves provided specific time frames in which the agency was supposed to act, the requirement that a hearing be held and determined without delay applies equally here, where the only specific time frame that the Act provides with regard to the agency's determination is the 60 days allotted to the Board to transmit its finding and recommendations to the Director (see 225 ILCS 15/16.1 (West 2002)). However, as noted, the Act further contains the overall requirement that proceedings following a summary suspension be "promptly instituted and determined." Accordingly, we address the other Mallen factors, the importance of the private interest and the government's justification for the delay, in light of Lyon's instruction that where an agency uses a lower standard of proof to support a prehearing deprivation, the necessity of acting promptly is heightened.

There is no doubt in this case that Morgan's interest in being able to continue his profession was substantial. See Loudermill, 470 U.S. at 543, 84 L. Ed. 2d at 504, 105 S. Ct. at 1494; Fusari, 419 U.S. at 389, 42 L. Ed. 2d at 529, 95 S. Ct. at 539. He was unable to practice his profession for nearly eight months, from November 4, 2003, until June 29, 2003. However, the Department's interest in preventing sexual misconduct by clinical psychologists licensed

under its authority is also undoubtedly strong. See 225 ILCS 15/1 (West 2004) (declaring that the practice of clinical psychology "affect[s] the public health, safety and welfare, and [is] subject to regulations in the public interest to protect the public from *** unprofessional conduct by persons licensed to practice clinical psychology"). Therefore, the Department cannot be faulted for giving the matter a fair amount of consideration.

The Department contends that the amount of time it took with the procedural steps involved in Morgan's summary suspension was justified. It contends that its interest in reaching a correct decision outweighed Morgan's interests and that the complexity of the matter justified its delay in reaching a decision. The Department points out that the ALJ had to consider testimony from a four-day hearing as well as information contained in 22 exhibits. The Department further contends that the time the Board took to issue its report to the Director was justified by the fact that it had to carefully consider the seriousness of Morgan's conduct in coming to it decision to recommend a longer suspension than that recommended by the ALJ. The Department has offered no explanation for why the Director waited until January of 2005 to adopt the Board's recommendation.

Based on these facts alone, we would have little difficulty in determining that the Department failed to act with the requisite promptness in waiting until January of 2005 to issue a final decision. While we have no doubt that this matter required careful deliberation, the Department's delay of over a year in reaching a final decision could hardly be considered prompt, particularly the delay from August of 2004, when the Director received the Boards report, until January of 2005, when he issued his final decision.

40

However, although the Department took over a year to reach its final decision on Morgan's summary suspension, Morgan's liberty and property rights which were entitled to due process protection (see Lyon, 209 Ill. 2d at 272, 807 N.E.2d at 431), and correspondingly to the protection of the Act, namely, his interests in his ability to practice his profession, were only affected up until the point that the chancery court intervened by entering a temporary restraining order against the Department on June 29, 2004. After that date, Morgan was able to resume the practice of his profession. Thus, we primarily consider the Department's delay up until that point, because after Morgan was allowed to resume his profession by order of the chancery court, there was no ongoing deprivation of Morgan's rights and no urgency for the Department to reach a prompt determination.

As noted, Morgan was summarily suspended on November 4, 2003. His hearing started on December 4, 2003, and finished on December 15, 2003. There is no indication that this time frame for the commencement and conclusion of the hearing was unduly prolonged. The chancery court entered a temporary restraining order ending his suspension on June 29, 2004. Thus, Morgan's summary suspension lasted a total of nearly eight months and continued for approximately 6 ½ months after the conclusion of his hearing.

As noted, section 16.1 of the Act describes the three stages involved in reaching final decision after a hearing: first, the hearing officer reports her findings to the Board and the Director, next, the Board has 60 days after receiving the hearing officer's report to issue its findings and a recommendation to the Director and, third, the Director issues a final decision. See 225 ILCS 15/21.6 (West 2002). Additionally, if the Board does not issue its

41

recommendation to the Director within 60 days, the Director may issue an order based on the hearing officer's report. See 225 ILCS 15/21.6 (West 2002). Thus, although presented in terms of an internal departmental deadline rather than a deadline directly affecting a subject's rights, the Act explicitly contemplates a delay of at least 60 days in reaching a decision after a hearing. It can be presumed that the Act also tacitly contemplates that the hearing officer (the ALJ in this case) and the Director will require a reasonable amount of time to complete their portions of the process.

Strong argument can be made that those steps of the process designated to the ALJ and the Director should not each exceed the 60 days allotted to the Board. The ALJ, having presided over the hearing, presumably has a ready familiarity with the case by the time the hearing concludes. The same cannot be said of the Board, which may or may not have attended the hearing. In this case, a single Board member attended only the first day of the five-day hearing. Similarly, there is strong argument to be made that the Director's portion of the process should not exceed an additional 60 days since he would have received the ALJ's report contemporaneously with the Board and would, therefore, already be familiar with the matter. Thus, it would appear that the final decision could reasonably have been finalized in as little as four months, allowing 30 days for the ALJ, 60 days for the Board, and an additional 30 days for the Director thereafter.

However, even if we were to consider that the 60 days allotted to the Board could also be extended to the ALJ and the Director, an amount of time that does not appear to be warranted, the final decision should have then been forthcoming in 180 days. By the time the chancery court

intervened and stayed the summary suspension, this 180-day time frame would have been exceeded by approximately 14 days, and by the time the Director issued his final decision, an additional 6 months would have passed. That the Department was dilatory in this case is further underscored by the fact Morgan's summary suspension was only terminated by intervention of the chancery court. The Department has not suggested that it, in the absence of the temporary restraining order, it would have resolved Morgan's summary suspension any quicker than it did, which, as noted, was not until January 28, 2005, 15 months after Morgan's summary suspension began. This conclusion is consonant with the conclusion of the chancery court when it intervened to stay the summary suspension, stating in its order: "The Court finds that Plaintiff suffers an irreparable injury in being prevent[ed] from practicing his profession without a decision on the summary suspension within a reasonable time after the post-suspension hearing."

The Department contends, however, that even if Morgan's summary suspension was unreasonably prolonged, the issue is moot and there is no remedy available to Morgan. The Department points out that the summary suspension ended in June of 2003, and the Department's eventual imposition of a three month suspension was considered served as soon as the Director issued that order. Morgan contends that the issue is not moot because he has requested a declaration that the Department violated his due process rights with regard to his summary suspension and because he has requested that, because of this violation, the Department's ultimate imposition of the three-month suspension must be reversed.

A matter is considered moot where "no controversy remains or the issues involved cease to exist, thereby rendering it impossible for the court to grant effective relief to the complaining

43

party." Katherine M. v. Ryder, 254 Ill. App. 3d 479, 485, 627 N.E.2d 42 (1993). Actions will be dismissed as moot once "[t]he plaintiffs have secured what they basically sought." People ex rel. Newdelman v. Weaver, 50 Ill. 2d 237, 241, 278 N.E.2d 81, 83 (1972).

With regard to Morgan's request that his posthearing suspension be reversed, we note that even though that suspension has long since ended, the suspension remains as a blight on his professional record. Moreover, although not discussed by the parties, we note that the Department's sanction of Morgan was not limited to the 90-day suspension which was immediately considered served, but additionally included "indefinite probation" with a minimum of two years and various conditions. Whether this probation has been since been completed is not clear in the record. Thus, it may well be that an active controversy apart from the ongoing stigma of the suspension yet exists between the parties. Furthermore, even if moot, the court may address a matter where there is substantial public interest (see Katherine M., 254 Ill. App. 3d at 486), or where, as here, it involves a matter of short duration that is likely to recur yet avoid judicial scrutiny. See In re A Minor, 127 Ill. 2d 247, 258, 537 N.E.2d 292, 296 (1989) ("this case, even if otherwise moot, involves an event of short duration which is ' "capable of repetitions, yet evading review." ' [Citations.]"); see also Barry, 443 U.S. at 66, 61 L. Ed. 2d at 476, 99 S. Ct. At 2650. ("[I]t is as likely as not that Barchi and others subject to relatively brief suspensions would have no opportunity to put the State to its proof until they have suffered the full penalty imposed"). To hold otherwise would permit the Department to ignore the requirements of due process in imposing summary suspensions because it is unlikely that a licensee could litigate a complaint before the summary suspension ended.

44

## III.  CONCLUSION

For all the foregoing reasons, we reverse the judgment of the circuit court and remand for proceedings consistent with this opinion.

Reversed and remanded.

FITZGERALD SMITH, P.J., and McNULTY, J., concur.